## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

EMTEL, INC.,                           §
                                       §
                    Plaintiff,         §
                                       §
v.                                     §        CIVIL ACTION NO. H-07-1798
                                       §
LIPIDLABS, INC, *et al.*,              §
                                       §
                    Defendants.        §

## MEMORANDUM AND ORDER

This infringement suit involves a patent for a method to provide "telemedicine" using videoconferencing to allow a physician to communicate with a medical caregiver and patient in a remote healthcare facility.  The patent holder, Emtel, Inc., alleges that Lipidlabs, Inc., Specialists On Call, Inc., Tele-Med Dox, LLC, and Doctors Telehealth Network, Inc., infringed United States Patent No. 7,129,970, which describes an "Emergency Facility Video-Conferencing System."  (Docket Entry No. 1).  Specialists On Call, Tele-Med Dox, and Doctors Telehealth Network have moved to dismiss for lack of subject-matter jurisdiction, and Lipidlabs has moved for summary judgment, on the basis of immunity from suit under 35 U.S.C. § 287(c).  (Docket Entry Nos. 20, 23).  Specialists On Call, Tele-Med Dox, and Doctors Telehealth Network have also moved for summary judgment that they do not directly infringe the '970 Patent because all the claimed steps are not performed or controlled by one entity.  (Docket Entry No. 21).

This suit raises an issue rarely addressed in the case law: the application of the medical immunity provision of 35 U.S.C. § 287(c)(1).  This suit also raises two issues that are the subject of recent cases in the Federal Circuit.  One issue involves the application of the standard set out in *BMC Resources Inc. v. Paymentech L.P.*, 498 F.3d 1373 (Fed. Cir. 2007), for direct infringement of business-method patents that require more than one person or entity to perform the claimed steps.  The second issue involves the standard for the patentability of business methods under 35 U.S.C. § 101 and the limits of *State Street Bank & Trust Co. v. Signature Financial Group, Inc*., 149 F.3d 1368 (Fed. Cir. 1998).  In February 2008, the Court of Appeals for the Federal Circuit *sua sponte* ordered an *en banc* rehearing in *In re Bilski*, 2008 WL 417680 (Fed. Cir. 2008).  *Bilski* may provide guidance on the extent to which business methods may receive patent law protection.

Based on a careful review of the record, the motions, responses, and replies, the arguments of counsel presented at a hearing, and the applicable law, this court finds that the medical immunity provision of section 287(c) does not apply and denies the motions to dismiss and for summary judgment based on that statute.  However, this court grants summary judgment to Specialists On Call, Tele-Med Dox, and Doctors Telehealth Network on the basis that the evidence does not raise a fact issue as to whether a single entity performs or controls the performance of all the claimed elements of the '970 Patent.  Because the Federal Circuit case law continues to develop, this court may also examine the impact of *In re Bilski* after it is issued and the parties have the opportunity to examine the opinion.

2

Emtel also moved for sanctions against Lipidlabs for failure to comply with the local rules of this district, (Docket Entry No. 26).  Emtel's motion for sanctions is denied.

The reasons for these rulings are set out below.

## I.        The Emtel '970 Patent

On October 31, 2006, Patent No. 7,129,970 B2 for a "Emergency Facility video-Conferencing System" was issued to Emtel.  (Docket Entry No. 22, Ex. 1).  The '970 Patent summarizes the invention as a

> video-conferencing arrangement having a mobile emergency center cart that can be positioned as needed within an emergency room or other medical facility and having a video camera enabling a remotely located medical practitioner to selectively and independently control various aspects of the video camera and audio equipment to thus enable the medical practitioner to visualize and communicate with both the patient and the emergency room personnel or closely inspect the physical condition of the patient so that the medical practitioner can diagnose and control the patient's treatment and visually inspect and talk with the patient prior to and during treatment .
> . . .

(*Id.*, Ex. 1 at cols. 2-3).

The '970 Patent has eight claims; the independent claims are Claims 1 and 4.  Claim 1 addresses the remote delivery of medical services through videoconferencing and Claim 4 addresses the remote delivery of emergency medical services through videoconferencing.

Claim 1 reads as follows:

> A business method for delivery of medical services utilizing a system including a plurality of satellite medical care facilities, at least one physician disposed at a central medical video-conferencing station, and a first patient and a first medical care

3

giver disposed in a first of said plurality of satellite medical care facilities, the method comprising the steps of:

(a)    establishing a video-conferencing communications system among said medical video-conferencing station and said plurality of satellite medical care facilities;

(b)    selecting said first of said plurality of satellite medical care facilities to actively receive video and audio communication from said physician;

(c)    controlling a video-conferencing system of said first of said plurality of satellite medical care facilities to control a video image received at said central medical video-conferencing station from said first of said plurality of satellite medical care facilities;

(d)    diagnosing a medical condition of said first patient at said first of said plurality of satellite medical care facilities by said physician from said central medical video-conferencing station;

(e)    providing instructions via said video-conferencing system to said first medical caregiver by said physician to treat said first patient at said first of said plurality of satellite medical facilities;

(f)    selecting a second of said plurality of satellite medical care facilities to actively receive video and audio communication from said physician;

(g)    displaying an image of a second patient disposed at said second of said plurality of satellite emergency care facilities at said central medical video-conferencing station;

(h)    controlling a video-conferencing system of said second of said plurality of satellite medical care facilities to control said image received at said central medical video-conferencing station from said second of said plurality of satellite medical care facilities;

4

(i)     diagnosing a medical condition of said second patient by said physician from said central medical videoconferencing station; and

(j)     providing instructions via said video-conferencing system to a second medical caregiver disposed at said second of said plurality of satellite medical care facilities by said physician to treat said second patient generally contemporaneously with said steps of diagnosing said medical condition of said first patient and providing instructions to said first medical caregiver.

(Docket Entry No. 22, Ex. 1, cols. 10-11).

Claim 4 states as follows:

A business method for delivery of emergency medical services utilizing a system including first and second emergency care facilities, an emergency room physician disposed at an emergency medical video-conferencing station, a first patient and a first skilled medical caregiver disposed at said first emergency care facility, and a second patient and a second skilled medical caregiver disposed at said second emergency care facility, the method comprising the steps of:

(a)     establishing a first video-conferencing communication link between said emergency medical video-conferencing station and said first emergency care facility;

(b)     establishing a second video-conferencing communication link between said emergency medical video-conferencing station and said second emergency care facility;

(c)     displaying an image of said first patient on a first monitor disposed in said emergency medical video-conferencing station via said first video-conferencing communication link;

(d)     viewing said image of said first patient by said emergency room physician;

(e)  controlling a video-camera disposed in said first emergency care facility from said emergency medical video-conferencing station to control said image of said first patient;

(f)  aiding a treatment of a medical condition of said first patient at said first emergency care facility by said emergency room physician from said emergency medical video-conferencing station;

(g)  displaying an image of said second patient at said emergency video-conferencing station via said second video-conferencing communication link;

(h)  controlling a video-camera disposed in said second emergency care facility from said emergency medical videoconferencing station to control said image of said second patient; and

(i)  aiding a treatment of a medical condition of said second patient at said second emergency care facility from said emergency medical video-conferencing station contemporaneously with said step of aiding the treatment of said first patient.

(Docket Entry No. 22, Ex. 1, Cols. 11-12).

## II.    The Accused Telemedicine Systems

Specialists on Call, Tele-Med Dox, and Doctors Telehealth Network (together, movants) provide what they characterize as "telemedicine support services" in the form of videoconferencing network links.  The movants enter into contracts with physicians or physician groups who agree to work as independent contractors in providing diagnostic and treatment services.  The movants also enter into contracts with remote medical-care facilities

under which the movants agree to provide outsourced videoconferenced medical services through the affiliated physicians or physician groups.

The movants receive requests for medical help, generally in a specialized area, from a remote medical facility, such as a hospital or emergency room. The movants have in place equipment that allows them to establish and maintain a videoconferencing connection between a physician who specializes in the area responsive to the request for medical help and the remote medical facility where the patient is located. The movants arrange for the appropriate physician to respond to the request from the remote facility through videoconferencing.

Tele-Med Dox and Doctors Telehealth Network each maintain centralized computer servers that receive requests for medical services from the remote facilities, match the requests to available physicians with the relevant speciality, and connect the appropriate physician with the requesting facility by a videoconferencing link established through the servers. The physician communicates with the remote healthcare facility through the server-established videoconferencing link. Specialists On Call maintains a toll-free call center that receives telephone requests for consultations from remote facilities and uses proprietary call-handling and information-gathering protocols to identify and contact the appropriate specialist physician. Specialists On Call then establishes a videoconferencing network link between the remote facility and the affiliated physician. (*Id.*, Exs. 2 ¶ 4, 3 ¶¶ 12-13, 4 ¶¶ 8-10).

Under the movants' contracts with the physicians or physician groups, the movants agree to provide business, administrative, and technological support to their affiliated physicians, as well as the necessary videoconferencing equipment.  Under these contracts, the physicians agree to provide medical services through the movants' telemedicine networks.  The contracts require the physicians to: provide medical care that conforms to generally accepted professional standards; maintain medical malpractice insurance and notify the defendants of any disciplinary action or malpractice claims; be available to provide care to a certain number of patients or be available to provide care on a certain schedule to be determined; and to provide care for a specified fee or rate.  (*Id.*, Exs. 2A-C, 3A, 4A).  The contracts identify the physicians as independent contractors who exercise independent judgment and maintain discretion over the medical care they provide to the patients.

Each of the movants has different billing and fee arrangements with the affiliated physicians.  Tele-Med Dox determines the patient fees, bills, collects billed fees, and pays its affiliated physicians each month.  Specialists On Call bills and collects fees in the name of and on behalf of its affiliated physicians, and its affiliated physicians pay it a monthly fee based on the physicians' revenue.  Doctors' Telehealth requires affiliated physicians to assign it the right to receive payment for the medical services the physicians provide and compensates the physicians based on a preset amount.  (*Id.*, Exs. 2A § 3.7.1, 3A § 3(b), 4A § 6).

The movants move to dismiss or for summary judgment based on statutory immunity and move for summary judgment of no infringement.  Lipidlabs moves for summary judgment based on statutory immunity.[1]  Both issues are addressed below.

### III.   The Motion to Dismiss and For Summary Judgment Based on Immunity under Section 287(c)

Section 281 of the Patent Act provides that "[a] patentee shall have remedy by civil action for infringement of his patent."  35 U.S.C. § 281.  Sections 283, 284, and 285 provide for injunctive relief, damages, and attorney's fees as a remedy for infringement.  35 U.S.C. §§ 283-285.  Section 287(c)(1) states that "[w]ith respect to a medical practitioner's performance of a medical activity that constitutes an infringement under section 271(a) or (b) of this title, the provisions of sections 281, 283, 284, and 285 of this title shall not apply against the medical practitioner or against a related health care entity with respect to such medical activity."  35 U.S.C. § 287(c)(1).

Section 287(c) is properly understood as an immunity provision.  *See* Charles Alan Wright & Charles H. Koch, Jr., 33 FEDERAL PRACTICE AND PROCEDURE § 8320 (3d ed. 2006)

---

[1]  Emtel declined to respond to the arguments made in Lipidlabs's motion, stating that "[g]iven the Motion's curtness, a response, apart from pointing out the Motion's obvious infirmities, is impossible without guessing this Defendant's positions, arguments, and potential evidence to support its Motion." (Docket Entry No. 26 at 7).  Emtel argues that the motion for summary judgment filed by Lipidlabs should be stricken for substantially failing to comply with the local rules of this District.  The local rules of the United States District Court for the Southern District of Texas provide that "[a] paper that does not conform to the local or federal rules or that is otherwise objectionable may be struck on the motion of a party or by the Court."  LR 11.4.  Emtel asserts that the motion for summary judgment filed by Lipidlabs violates the Local Rules because it does not include adequate authority, is not accompanied by a proposed order, is not double-spaced, does not include the designation "attorney-in-charge" under the attorney's signature or the attorney's facsimile number, and does not include necessary affidavits or other documentary evidence.  (Docket Entry No. 26).  Because this court denies Lipidlabs's motion for summary judgment on the merits, Emtel's motion for sanctions is moot.

("An immunity, unlike a privilege, avoids liability under all circumstances.  It does not deny the injury but rather prevents any liability.").  The defendants argue that they are immune from suit under section 287(c) because the alleged infringement involves the performance of a "medical activity" by a "medical practitioner" and because the defendants are "related health care entities."  (Docket Entry No. 20 at 8-10).

The term "medical activity" is defined as "the performance of a medical or surgical procedure on a body."  "Body" is defined as "a human body, organ or cadaver, or a nonhuman animal used in medical research or instruction directly relating to the treatment of humans."  35 U.S.C. § 287(c)(2)(A), (E).  The statute limits the term "medical activity" by stating that it shall not include (I) the use of a patented machine, manufacture, or composition of matter in violation of such patent, (ii) the practice of a patented use of a composition of matter in violation of such patent, or (iii) the practice of a process in violation of a biotechnology patent."  35 U.S.C. § 287(c)(2)(A).  A "medical practitioner" is defined as "any natural person who is licensed by a State to provide the medical activity described in subsection (c)(1) or who is acting under the direction of such person in the performance of the medical activity."  35 U.S.C. § 287(c)(2)(B).  A "related health care entity" is "an entity with which a medical practitioner has a professional affiliation under which the medical practitioner performs the medical activity, including but not limited to a nursing home, hospital, university, medical school, health maintenance organization, group medical practice, or a medical clinic."  35 U.S.C. § 287(c)(2)(C).  A "professional affiliation" refers to "staff privileges, medical staff membership, employment or contractual relationship,

10

partnership or ownership interest, academic appointment, or other affiliation under which a medical practitioner provides the medical activity on behalf of, or in association with, the health care entity."  35 U.S.C. § 287(c)(2)(D).[2]

The issues under section 287(c) are whether the allegedly infringing acts involve the performance of a "medical or surgical procedure on a body"; whether the medical activities comprise less than all of the steps allegedly claimed in the '970 Patent; and whether the defendants are "related health care entities" given that the affiliated physicians perform medical services as independent contractors.  (Docket Entry No. 28 at 2-3).  Emtel also argues that the defendants' broad interpretation of section 287(c) would be unconstitutional as an improper use of congressional power over patents.  (*Id.* at 3-4).

## A.    Whether the Alleged Infringing Acts Involve "The Performance of a Medical or Surgical Procedure on a Body"

The defendants assert that the following elements of the independent claims call for "the performance of a medical or surgical procedure on a body": step (d) of Claim 1, "diagnosing a medical condition of said first patient at said first of said plurality of satellite medical care facilities by said physician from said central medical video-conferencing station"; step (j) of Claim 1, "providing instructions via said video-conferencing system to a second medical caregiver disposed at said second of said plurality of satellite medical care

---

[2] In moving to dismiss, Specialists on Call, Tele-Med Dox, and Doctors Telehealth Network contend that section 287(c) immunity deprives a federal court of subject-matter jurisdiction over an infringement suit and is properly addressed under Rule 12(b)(1) of the Federal Rules of Civil Procedure.  (Docket Entry No. 20).  Because the movants do not satisfy the requirements for immunity under section 287(c), the question of whether section 287(c) is jurisdictional is not addressed.

facilities by said physician to treat said second patient generally contemporaneously with said steps of diagnosing said medical condition of said first patient and providing instructions to said first medical caregiver"; and step (f) of Claim 4, "aiding a treatment of a medical condition of said first patient at said first emergency care facility by said emergency room physician from said emergency medical video-conferencing station," as well as other steps in those claims that use almost identical language. (Docket Entry No. 20 at 8). Emtel asserts that the medical acts performed by the affiliated medical practitioners – diagnosing a medical condition, providing instructions to a medical caregiver about treating a patient, or aiding the treatment of a medical condition – are not "medical or surgical procedures" performed "on a body." (Docket Entry No. 28 at 8-12).

In interpreting a statute, a court should "give words their ordinary, contemporary, common meaning unless Congress has indicated otherwise, and with a view to their place in the overall statutory scheme." *Medrad, Inc. v. Tyco Healthcare Group LP*, 466 F.3d 1047, 1051 (Fed. Cir. 2006) (citations and quotations omitted). It is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132 (1993); *see also Flores v. Rios*, 36 F.3d 507, 513 (6th Cir. 1994) ("Laws cannot be interpreted by snatching single words out of statutory sentences and matching these words – without regard for context – up against one of the many definitions of that word found in the advocate's dictionary of choice."). A court must "begin with the words of the statute, *see Trayco, Inc. v. United States*, 994 F.2d 832, 836 (Fed. Cir. 1993),

but may consult dictionaries, *see Bayer AG v. Housey Pharms., Inc.*, 340 F.3d 1367, 1371 (Fed. Cir. 2003), and legislative history, *see Neptune Mut. Ass'n Ltd. of Bermuda v. United States*, 862 F.2d 1546, 1549 (Fed. Cir. 1988), if necessary to construe the statute." *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1315 (Fed. Cir. 2005).

Emtel argues that "a Diagnosis is not a 'medical or surgical procedure,' but occurs beforehand.  A doctor must diagnose a problem before he can perform a medical or surgical procedure."  (Docket Entry No. 28 at 10).  But in the medical context, a "procedure" can refer to diagnosis.  *See* STEDMAN'S MEDICAL DICTIONARY 1563 (28th ed. 2006) (defining "procedure" as an "[a]ct or conduct of diagnosis, treatment, or operation"); *see also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1539 (31st ed. 2007) ("A series of steps by which a desired result is accomplished.").

Emtel argues that the legislative history supports its interpretation.  Section 287(c) has an unusual legislative history.  A federal medical-immunity bill was first proposed in response to a 1993 patent infringement lawsuit against a physician.  The patent covered a method for making self-sealing incisions in the eye during cataract surgery.[3]  "The Medical Procedures Innovation and Affordability Act," H.R. 1127, was introduced in the House of

---

[3] *See* Leisa Talbert Peschel, *Revisiting the Compromise of 35 U.S.C. § 287(c)*, 16 TEX. INTELL. PROP. L. J. 299, 304-08 (2008); Andres Rueda, *Cataract Surgery, Male Impotence, Rubber Dentures and a Murder Case – What's So Special About Medical Process Patents?*, 9 U. BALT. INTELL. PROP. L.J. 109, 142-47 (2001); Weldon E. Havins, *Immunizing the Medical Practitioner "Process" Infringer: Greasing the Squeaky Wheel, Good Public Policy, or What?*, 77 U. DET. MERCY L. REV. 51, 52-53 (1999); Eric M. Lee, *35 U.S.C. § 287(c) – The Physician Immunity Statute*, 79 J. PAT. & TRADEMARK OFF. SOC'Y 701, 701–07 (1997); Gerald J. Mossinghoff, *Remedies Under Patents on Medical and Surgical Procedures*, 78 J. PAT. & TRADEMARK OFF. SOC'Y 789, 789-90 (1996).

Representatives on March 3, 1995.  Rather than providing immunity for physicians performing medical procedures, H.R. 1127 barred the issuance of most medical process patents.[4]  The bill was supported by the  medical community but opposed by the patent bar and the biotechnology industry as overly broad and unclear.  An amended version, H.R. 3814, presented a narrower bar to the issuance of medical procedure patents.[5]  This amendment did not proceed.

In response to the biotechnology industry's opposition to H.R. 1127, a bill was introduced in the Senate proposing physician immunity as an alternative to banning the issuance of medical procedure patents.  S. 1334, the "Medical Procedures Innovation and Affordability Act," provided:

> For any patent issued on or after the effective date of this subsection, it shall not be an act of infringement for a patient, physician, or other licensed healthcare practitioner, or a healthcare entity with which a physician or licensed healthcare practitioner is professionally affiliated, to use or induce others to use a patented technique, method, or process for performing a surgical medical procedure, administering a surgical or

---

[4]  H.R. 1127 provided:

LIMITATION ON ISSUANCE OF PATENTS.  On or after the date of the enactment of this Act, a patent may not be issued for any invention or discovery of a technique, method, or process for performing a surgical or medical procedure, administering a surgical or medical therapy, or making a medical diagnosis, except that if the technique, method, or process is performed by or as a necessary component of a machine, manufacture, or composition of matter or improvement thereof which is itself patentable subject matter, the patent on such machine, manufacture or composition or matter may claim such technique, method, or process.

H.R. 1127, 104th Cong. (1st Sess. 1995).

[5]  *See* 142 Cong. Rec. H8254-03, H8276–80 (daily ed. July 24, 1996); Mossinghoff, *supra*, at 792.

> medical therapy, or making a medical diagnosis. This section does not apply to the use of, or inducement to use, such a patented technique, method, or process by any person engaged in the commercial manufacture, sale, or offer for sale of a drug, medical device, process, or product that is subject to regulation under the Federal Food Drug, and Cosmetic Act or the Public Health Service Act.

S. 1334, 104th Cong. (1st Sess. 1995). The medical community supported this bill. In testimony before the House Subcommittee on Courts and Intellectual Property, a physician representing a broad coalition of medical societies, including the American Medical Association, testified:

> H.R. 1127 follows the lead of over 80 other countries that have banned medical procedure patents. While we support this nonpatentability approach in principle and find it to be most consistent with the ethical standards of the medical profession, we also understand the philosophical objections to a ban on patentability, as well as the practical problems in crafting a ban that does not sweep so broadly as to encompass methods of use patents for drugs, medical devices, and biological products and processes. Senator Frist's bill, which does not ban medical procedure patents, but instead exempts the use of a patented medical procedure by a patient, physician, or other health care provider from infringement liability, addresses these concerns. This non-infringement bill is consistent with the approach in Section 271(e) of the patent statute. For these reasons, we believe the Senate bill provides the preferable alternative.

*The Medical Procedures Innovation and Affordability Act: Hearings on H.R. 1127 Before the House Judiciary Subcommittee on Courts and Intellectual Property*, 104th Cong., 1995 WL 615751 (October 19, 1995) (testimony of Charles D. Kelman, M.D., American Society of Cataract and Refractive Surgery).

S. 1334 failed to pass.  Another physician immunity bill was introduced on September 24, 1996.  Although it did not pass, its substantive provisions were included in a bill passed one week later in the House as H.R. 3610.[6]  Senator Frist spoke in favor of the provisions he had originally introduced as S. 2105.  His comments make clear that he viewed these provisions as protecting against infringement actions for "pure procedure" patents, as distinct from biotechnology, medical device, and drug patents:

> The appropriateness and importance of allowing patents for pharmaceuticals and medical devices is now well-established.  But the appropriateness of patenting medical innovations that do not involve drugs or devices but are simply improvements in surgical or medical techniques remains highly controversial.  I think for good reason.  Unlike innovations in medical drugs and devices, innovations in pure procedures – such as discovering a better way to suture a wound or set a broken bone – are constantly being made without the need of significant research investments. . . .  My legislation would prevent the enforcement of so-called pure medical procedure patents against health professionals.  It would in no way, however, change patent law with respect to biotechnology, medical devices, drugs or their methods of use.  As a result, this narrowly tailored legislation would in no way discourage the important research being done in these areas of medicine. . . . My legislation is very narrow in scope.  It would simply prevent the enforcement of patents against health professional or their affiliated facilities for pure procedure patents such as Dr. Pallin's.  It does not impact in any way the patentability of medical devices, drugs, or their methods of use.

---

[6]  *See* 142 Cong. Rec. S12023-01, *S12023, 1996 WL 553950 (daily ed. Sept. 30, 1996) (statement of Sen. Frist); 142 Cong. Rec. S11169-03, S11173,  1996 WL 539434 (daily ed. Sept. 24, 1996) (statement of Sen. Frist); Havins, *supra*, at 67.  When H.R. 3610 was sent to the Senate, it was linked to H.R. 4278, the omnibus appropriations bill, as a conference report, obligating the Senate to vote without amendment.  *See* 142 Cong. Rec. S11815–16 (daily ed. Sept. 30, 1996) (statement of Sen. Lott); Peschel, *supra*, at 308.

142 Cong. Rec. S12023-01, S12023, 1996 WL 553950 (daily ed. Sept. 30, 1996) (statement of Sen. Frist).  The Senate passed the bill on September 30, 1996.  The President signed the legislation, which included new subsection (c) to 35 U.S.C. § 287, the same day.  *Havins*, *supra*, at 68.

Emtel argues that the legislative history shows that Congress viewed "surgical and medical procedures" as distinct from, and exclusive of, "administering a surgical or medical therapy" and "making a medical diagnosis."  (Docket Entry No. 28 at 11).  Emtel relies on the fact that the original House physician-immunity bill applied to any "invention or discovery of a technique, method or process for performing a medical or surgical procedure, administering a surgical or medical therapy, or making a medical diagnosis," and the original Senate physician-immunity bill applied to "patent[ed] technique[s], method[s] or process[es] for performing surgical or medical procedure[s], administering a surgical or medical therapy, or making a medical diagnosis."  Earlier proposed bills listed "performing a medical or surgical procedure" separately from "administering a surgical or medical therapy" and "making a medical diagnosis."  The last two terms were not included in the medical immunity provision that was passed.  This legislative history does not, however, lead to the conclusion that Congress viewed "surgical and medical procedures" as excluding "administering a surgical or medical therapy" or "making a medical diagnosis."  It is equally plausible that these phrases were not included in the legislation because "surgical and medical procedures" include "administering a surgical or medical therapy" and "making a medical diagnosis."

The legislative history does show that section 287(c) was intended to protect physicians from infringement suits for the procedures they use to treat patients, while allowing patent protection for medical devices, biotechnology, or drugs and the methods of using them.  142 Cong. Rec. S12023-01, *S12023, 1996 WL 553950 (daily ed. Sept. 30, 1996) (statement of Sen. Frist).  The debate centered over what exceptions to the broad physician-immunity rule would be made to retain enforceable medical device, biotechnology, and drug patent protection.  The legislative history does not support Emtel's argument that diagnosing a patient is not a "medical or surgical procedure" subject to physician immunity provision.

Emtel invokes the statutory construction rule *noscitur a sociis*, meaning that a word is known by the company it keeps.  Emtel argues that "providing instructions" through a videoconferencing system to a medical caregiver at a satellite facility to treat a patient at that facility – step (e) of Claim 1 – and "aiding a treatment" of a medical condition of the patient at the remote emergency care facility – step (f) of Claim 4 – are not "medical or surgical procedures."  (Docket Entry No. 28 at 11).  Emtel argues that because the physician doing the "instructing" and "aiding a treatment" is in a separate location from the patient, and because the physician is using videoconferencing to communicate with a medical caregiver who is with the patient, the term "aiding" in the '970 Patent "must be interpreted to mean providing guidance, instruction, support, etc. to the medical caregiver, who provides the treatment to the patient."  (*Id.* at 11 n.12).  Emtel argues that a "'surgical' procedure involves what a doctor does to a patient" and that a "'medical' procedure should be understood in the

18

same way, and not as having to do with instructions, supervision, or a medical business method."  (*Id.* at 11–12).

Section 287(c) defines a "medical activity" as "the performance of a medical or surgical procedure on a body."  The "accepted canon of statutory construction is to treat the disjunctive 'or' as giving independent meaning to the words it separates, unless the context of the statute requires otherwise."  *Resolution Trust Corp. v. CedarMinn Bldg. Ltd. P'ship*, 956 F.2d 1446, 1452 (8th Cir. 1992) (additional citations omitted) (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)).  The words "medical" and "surgical" are different activities.  Both "medical" and "surgical" activities may require and include providing treatment instructions to another caregiver to aid that caregiver in giving treatment.  The term "medical or surgical procedures" does not exclude a physician "providing instructions" to a medical caregiver to enable that caregiver to treat a patient.  Nor does the term exclude a physician "aiding a treatment of a medical condition" by a medical caregiver who, with a patient, is at another location.

Finally, Emtel asserts that diagnosing a medical condition, providing instructions to a medical caregiver regarding the treatment of a patient, or aiding a treatment of a medical condition are not "medical or surgical" activities performed "on a body."  (Docket Entry No. 28 at 8-10).  Emtel argues that the ordinary meaning of the phrase "on a body" in section 287(c) is "physically directed at or physically affects a single body."  Emtel asserts that "diagnosing a medical condition" in Claim 1, section (d) "is an act that occurs in the mind of the diagnosing physician" and is not performed on a patient's body.  Emtel argues that

because "providing instructions . . . to treat said . . . patient" in Claim 1, section (e) and "aiding a treatment of a medical condition of said . . . patient" in Claim 1, section (f) are communicated by the physician specialist via videoconferencing to a remotely located medical caregiver, these steps are not performed "on" a patient's body. "In all cases, because the physician is not present with the body and only views the body via a video-conferencing system, the physician cannot perform a physical procedure *on* the body." (*Id.* at 10).

Emtel and the movants agree that, in this context, the word "on" is "[u]sed to indicate the object affected by actual, perceptible action" or "[u]sed to indicate the object of an action directed, tending, or moving against it." AMERICAN HERITAGE DICTIONARY 953 (3d ed. 1997). A subject may act in a way that "affects" an object or "direct" an action toward an object without physically touching it. The legislative history makes clear that the statute immunizes physicians from patent suits for performing medical procedures in treating a patient, while allowing the enforceable patent protection for medical devices, drugs, or biotechnologies. Reading the preposition "on" as requiring direct physical contact would exclude a number of medical procedures from the immunity provision. This reading would undermine the statute's purpose. "On the body" requires that the medical or surgical "activity" be directed at or affect the patient's body. Diagnosing a medical condition, providing instructions to a different medical caregiver in a different location about treating that caregiver's patient, and aiding another caregiver in treating a patient's medical condition, are "activities" that are directed at or affect a patient's body. Emtel's first argument to avoid the application of section 287(c) fails.

### B.    Whether the Movants are "Related Health Care Entities"

A "related health care entity" is "an entity with which a medical practitioner has a professional affiliation under which the medical practitioner performs the medical activity, including but not limited to a nursing home, hospital, university, medical school, health maintenance organization, group medical practice, or a medical clinic."   35 U.S.C. § 287(c)(2)(C).   A "professional affiliation" refers to "staff privileges, medical staff membership, employment or contractual relationship, partnership or ownership interest, academic appointment, or other affiliation under which a medical practitioner provides the medical activity on behalf of, or in association with, the health care entity."   35 U.S.C. § 287(c)(2)(D).  Emtel argues that the movants are not "related health care entities" because they have "merely a business affiliation" with their affiliated physicians, not a "medical affiliation."  (Docket Entry No. 28 at 13).  Emtel argues that the examples of a "related healthcare entity" provided in the statute make "clear that the professional affiliation that is being referred to is a medical affiliation, not merely a business affiliation."  (*Id.*).  Emtel invokes the statutory construction rule that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar to those enumerated by the specific words."  *Wash. State Dept. of Soc. and Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 372 (2003).  Emtel asserts that a physician's telephone company or landlord is clearly not a "related health care entity," despite the fact that the physician has "contracts with them and [is] using their services or property in his

medical practice."  Emtel argues that the movants have similar, purely "business," relationships with their affiliated physicians.  (Docket Entry No. 28 at 13-14).

The movants enter into affiliation agreements with physicians or physician groups and separate agreements with remote medical care facilities.  In the agreements with the medical care facilities, the movants agree to provide outsourced medical diagnosis or treatment from affiliated physicians.  The movants' affiliation agreements with the physicians or physician groups require the medical professionals to provide the medical services called for in the movants' agreements with remote care facilities.  Unlike a physician's contract with a phone company or landlord, the affiliated physicians do not merely agree to use the movants' services or property in medical practice.  Rather, the agreements call for the movants to match a request for medical assistance from a remote medical facility with an affiliated physician who has a particular responsive speciality, and for that physician to use videoconferencing to view a patient who is located in the remote facility and provide medical services to that patient.  (Docket Entry No. 22, Exs. 2A-C, 3A, 4A).  The movants are "related health care entities."

### C.    Whether Performing the Medical Activities Described in the Independent Claims "Constitutes an Infringement"

Emtel argues that even if diagnosing a medical condition of a patient in a remote medical care facility, providing instructions to a remote medical caregiver to treat such a patient, or aiding a treatment of a medical condition of a patient at a remote emergency care facility are "medical activities," each activity is only one step of a business-method claim.

Emtel argues that the performance of a single step in a business-method claim does not itself constitute an infringement.  Emtel asserts that section 287(c) only applies when the business-method claim as a whole is a "medical activity."  (Docket Entry No. 28 at 15-17).  The movants argue that performing any medical activities that "are necessary elements of any infringement" constitutes an infringement, triggering the section 287(c) immunity from suit. (Docket Entry No. 30 at 6).

"For process patent or method patent claims, infringement occurs when a party performs all of the steps of the process." *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007); *see also Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993).  The independent claims in the '970 Patent are for a business method to provide medical care to patients in remote healthcare locations through the use of videoconferencing equipment.  In each of the two independent claims, medical activities make up only some of the steps claimed in the nine– or ten–step business method.  Claim 1 requires a physician to diagnose a medical condition of a patient located at a remote facility and to provide instructions to a medical caregiver located at the remote facility.  Claim 1 also requires establishing a videoconferencing communications system between a medical videoconferencing station and satellite medical care facilities, selecting the satellite facility to receive video and audio communications from the physician, controlling the videoconferencing system, and displaying an image of the patient.  Similarly, Claim 4 requires an emergency room physician to aid a treatment of a medical condition of a patient at a remote emergency medical videoconferencing center.  Claim 4 also requires establishing

23

videoconferencing communication links, displaying an image of the patient; having the emergency room physician view that image; and controlling the video camera in the remote facility. (*Id.*).  Performing the medical-activity steps of diagnosing a medical condition, providing instructions to a medical caregiver to treat a patient, or aiding a treatment of a medical condition would not infringe either claim unless all the other steps are also performed.

The movants urge that the ordinary meaning of "constitutes" is "[t]o be the elements or parts of, compose," AMERICAN HERITAGE DICTIONARY 298 (3d ed. 1997), and that fewer than all of the necessary elements of a claim "constitute" a claim if they are necessary elements. (Docket Entry No. 30 at 6).  The movants argue that otherwise, "a patentee could always circumvent Section 287(c) and enforce claims reciting medical or surgical procedures merely by including a trivial non-medical limitation, for example, by adding the limitation 'washing hands' or 'obtaining informed consent' to a method claiming no-stitch cataract surgery." (Docket Entry No. 30 at 7).

The method claimed in the '970 Patent is not a method for performing a specific medical procedure.  Claim 1 includes as an element a physician communicating through videoconferencing with a remote medical facility to diagnose a medical condition of a patient located at that facility and to provide instructions to a medical caregiver located at that facility to treat that patient.  Claim 4 includes an emergency room physician in one emergency care facility communicating with a skilled medical caregiver in a remote emergency care facility through videoconferencing, to have the first physician view an image

of a patient at the remote facility and to have that physician aid a "treatment of a medical condition" of that patient.  Claims 1 and 4 include performing medical activities, but these claims are not infringed merely by performing the medical activities included in those claims. A physician would not infringe the '970 Patent by performing a medical procedure on a patient.  A physician could only infringe by using the videoconferencing method claimed in the '970 Patent in performing those medical procedures.  As Emtel states, "Defendants are free to practice the medical acts of diagnosing, providing instructions, and aiding in medical treatments without infringing the patent." (Docket Entry No. 28 at 17).  This does not mean that a medical-procedure claim would lose that status simply because one element or step that is an incidental aspect of medical activities – such as "washing hands" or "obtaining informed consent" – is not in itself a "medical activity."  The claimed steps of the '970 Patent are not an incidental nonmedical part of medical practice.  Section 287(c) immunity does not apply because merely performing the medical activities included as steps of Claims 1 and 4 of the '970 Patent would not "constitute an infringement" of that patent.

The  motion to dismiss and the motion for summary judgment based on statutory immunity under section 287(c) are denied.

## IV.    The Motion for Summary Judgment of Noninfringement

### A.    The Applicable Legal Standards

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the

absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  Although the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "'An issue is material if its resolution could affect the outcome of the action.'" *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).  "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted).  "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a 'scintilla' of evidence.'" *Little*,

37 F.3d at 1075 (internal citations omitted).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255 (citation omitted).

Patent infringement claims involve two analytic steps.  *Mars, Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1373 (Fed. Cir. 2004); *Scanner Tech. Corp. v. ICOS Vision Sys. Corp., N.V.*, 365 F.3d 1299, 1302 (Fed. Cir. 2004).  First, the court determines the meaning and scope of the asserted claims.  *Scanner Tech.*, 365 F.3d at 1302; *Novartis Pharm. Corp. v. Eon Labs Mfg., Inc.*, 363 F.3d 1306, 1308 (Fed. Cir. 2004).  Claim construction is a matter of law. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).  A court primarily relies on intrinsic evidence – the claims, the written specification, and the prosecution history – to understand the claims.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).  In most cases, the best source for determining the meaning of claim terms is the specification in which the patentee describes the invention.  A court may secondarily rely on extrinsic evidence, including expert testimony, dictionaries, and technical treatises, to understand the meaning and scope of particular terms.  *Id.*  Second, the claims as construed are compared to the allegedly infringing method or product to determine whether the claims encompass the accused method or product.  *Bai*, 160 F.3d at 1353.

**B.     The Parties' Contentions**

The movants seek summary judgment of noninfringement on the basis that as a matter of law, Emtel cannot show that a single entity performs or causes to be performed all the elements of Claim 1 or Claim 4 of the '970 Patent.  Direct infringement of a business-method

27

claim occurs only when a single party "control[s] or direct[s]" the performance of all the steps or elements of a claimed method. *BMC Resources,* 498 F.3d at 1378. "[T]he control or direction standard is satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method." *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1330 (Fed. Cir. 2008).

The '970 Patent requires several entities. There must be an entity, such as the movants, providing and operating the videoconferencing system. There must be a physician. And there must be a remote medical care facility in which there is a caregiver and a patient. The independent claims call for actions by both the provider/operator of the videoconferencing system and the physician who diagnoses a medical condition of the remote patient and gives instructions to a remote caregiver to treat that patient or aids a treatment of that patient. Claim 1 requires the following steps: establishing a videoconferencing communications system between a medical videoconferencing station and satellite medical care facilities; selecting a satellite facility to receive video and audio communications from a physician; controlling a videoconferencing system; displaying an image of a patient; *a physician* diagnosing a medical condition; and *a physician* providing instructions to a caregiver located at a remote facility. (Docket Entry No. 22, Ex. 1). Claim 4 requires the following steps: establishing videoconferencing communication links; controlling a video camera; displaying an image; *a physician* viewing that image, and *a physician* aiding a treatment of a medical condition. (*Id.*).

28

Emtel asserts that because the movants have contracted with individual physicians or physician groups to perform the medical activities necessary to deliver telemedicine services to patients in remote locations through videoconferencing, there is sufficient evidence of the movants' direction or control over all the steps of the claimed method to preclude summary judgment. Emtel argues in the alternative that the movants and physicians mutually direct and control each other, or that the physicians direct and control the movants. The movants acknowledge that they contract with individual physicians and physician groups, compensate them for medical services, require that the medical services conform with generally accepted professional standards, provide administrative support for the physicians, and match which physician has the expertise for a particular telemedicine consult. But the contracts also stipulate that the physicians maintain discretion and control over the diagnoses they perform, the medical instructions they provide, and the medical treatment they aid in providing. (Docket Entry No. 21 at 4; Docket Entry No. 22, Exs. 2A-C, 3A, 4A). Emtel does not dispute that the movants exercise no control or direction over how or what medical diagnoses, instructions, or treatment are provided by the physicians. The issue is whether these contracts give the movants the direction or control over the affiliated physicians necessary to support the conclusion that the actions of the movants and the physicians may be combined to find direct infringement by the movants.

## C.    The Federal Circuit "Direct or Control" Standard

In *BMC Resources* and *Muniauction*, the Federal Circuit recently addressed the requirements for finding direct infringement when no single party performs every step of the

29

asserted claims.  In *BMC Resources*, decided in 2007, and *Muniauction*, decided in 2008, the Federal Circuit put to rest the suggestion in some prior cases that multiple parties acting independently to perform all the claimed steps of a method patent could directly infringe that patent.  The Federal Circuit reaffirmed that direct infringement occurs only when a single party "performs all of the steps of the process," or "direct[s] or control[s]" the performance of those steps.  498 F.3d at 1378-382; 532 F.3d at 1328-330.

In *BMC Resources,* the Federal Circuit recognized that the "direct or control" standard "may in some circumstances allow parties to enter into arms-length agreements to avoid infringement."  The court concluded that this concern presented an insufficient basis to expand the rules governing direct infringement to "reach independent conduct of multiple actors."  498 F.3d at 1381.[7]  At the same time, the court insisted that the direction or control standard does not "provide a loophole for a party to escape infringement by having a third party carry out one or more of the claimed steps on its behalf."  *Id.* at 1379.  "It would be unfair indeed for the mastermind in such situations to escape liability."  *Id.* at 1381.  In *Muniauction*, discussing *BMC Resources*, the Federal Circuit recognized that these twin goals – requiring that a single party perform each step of a patent and avoiding a "loophole" for defendants to contract around infringement – are not always consistent.  The *Muniauction* court recognized a "spectrum" of multiple-party relationships.  At one end is "mere arms-length cooperation," which is insufficient to establish infringement.  At the other end is

---

[7] The *BMC Resources* court also noted that this possibility can often be "offset by proper claim drafting" to "capture infringement by a single party."  *Id*.

"control or direction over the entire process such that every step is attributable to the controlling part, i.e., the mastermind," which is sufficient to establish infringement. 532 F.3d at 1329. The outcome of applying the direction or control standard depends on where on this spectrum a particular case falls.

In both *BMC Resources* and *Muniauction*, the Federal Circuit stated that a party could be liable for direct infringement if that party directed or controlled the acts of another in performing some of the claimed method steps to such an extent as to be vicariously liable for those acts. In *BMC Resources*, the court used concepts of agency and vicarious liability to define when direct infringement can be found despite the fact that no single party performs every step of the claimed method. "[T]he law imposes vicarious liability on a party for the acts of another in circumstances showing that the liable party controlled the conduct of the acting party." *Id.* at 1379.[8] The court in *Muniauction* reaffirmed the importance of vicarious

---

[8] In support of this proposition, the *BMC Resources* court cited the RESTATEMENT (SECOND) OF AGENCY § 220, comment d. Section 220 addresses the control necessary to find a "master-servant" relationship as opposed to that of an independent contractor. Section 220 states:

(1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

(2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:

(a) the extent of control which, by the agreement, the master may exercise over the details of the work;

(b) whether or not the one employed is engaged in a distinct occupation or business;

(c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;

liability in determining infringement and made a more definitive statement: "[T]he control or direction standard is satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete the performance of a claimed method."  532 F.3d at 1330 (concluding that direct infringement had not been established because the plaintiff "ha[d] identified no legal theory under which [defendant] might be vicariously liable for the actions of affiliated parties").

---

        (d) the skill required in the particular occupation;

        (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;

        (f) the length of time for which the person is employed;

        (g) the method of payment, whether by the time or by the job;

        (h) whether or not the work is a part of the regular business of the employer;

        (I) whether or not the parties believe they are creating the relation of master and servant; and

        (j) whether the principal is or is not in business.

Comment d states, in relevant part:

        d. *Control or right to control*. Although control or right to control the physical conduct of the person giving service is important and in many situations is determinative, the control or right to control needed to establish the relation of master and servant may be very attenuated.  In some types of cases which involve persons customarily considered as servants, there may even be an understanding that the employer shall not exercise control. Thus, the full-time cook is regarded as a servant although it is understood that the employer will exercise no control over the cooking.  In other types of situations where an emergency creates peril to human lives, as in the case of a ship in a storm, a servant–in this case the captain–might properly refuse to be controlled by the ship owner and still cause his master to be liable for his negligence or other faulty conduct.

In both *BMC Resources* and *Muniauction*, the Federal Circuit concluded that the facts of the case did not show direct infringement.   The facts of *BMC Resources* and *Muniauction*, and of district court cases that have applied the standard the Federal Circuit set out, provide further guidance as to whether, as a matter of law, the movants did not directly infringe the '970 Patent.

• *BMC Resources* and *Muniauction*

In *BMC Resources,* the patents at issue claimed a method for processing debit transactions without a personal identification number.   498 F.3d at 1375.   The patent described an interface between a telephone and a debit-card network, through which a customer could pay bills and conduct other business with a payee using only a telephone keypad.  *Id.*  The method required the combined action of several parties to receive, transmit, and process the data input by the customer:  the payee's agent, a remote payment network, and the card-issuing financial institution.  *Id.*  Paymentech, the accused infringer, provided a service that collected payment data (including debit-card numbers, names, and the purchased amounts) from a payee's agent and then transferred those data to a remote payment network, which would in turn forward that information to a financial institution. *Id.* at 1375-76.   Paymentech transmitted only the payment data; it did not provide "instructions or directions regarding the use of those data."  *Id*. at 1381.

The plaintiffs acknowledged that Paymentech did not itself perform every step of the patented method but argued that by providing data, it controlled or directed the remote payment networks and the financial institutions in performing the remaining steps.  *Id*.  The

Federal Circuit rejected this argument.  The fact that Paymentech provided data to the debit networks did not provide a basis for inferring that BMC gave instructions or directions about the use of that data.  *Id.*  There was also no evidence in the record "*even of*" a contractual relationship between the defendant and the financial institutions that performed some of the steps claimed in the method patent.  *Id.* at 1382 (emphasis added).  The court found that the evidence did not raise a fact issue as to whether the defendant controlled or directed the debit networks and financial institutions, as necessary to show direct infringement.  There was no basis to find that Paymentech directed or controlled the debit networks or financial institutions so as to make Paymentech bear responsibility for their actions.  "Without this direction or control of both the debit networks and the financial institutions, [the defendant] did not perform or cause to be performed each and every element of the claims."  *Id.*

In *Muniauction*, the patent at issue claimed a computer system through which municipal bond issuers could initiate and monitor bond auctions, and bidders could prepare, submit, and monitor bids, on one central server.  532 F.3d at 1322.  The patent, as drafted, required the combined actions of a bidder and a computer system.  The accused infringer, Thomson, ran a central server that enabled many of the same auction activities described in the plaintiff's patent.  *Id.* at 1323.  The plaintiffs argued that the direction or control standard was satisfied because "Thomson control[led] access to its system and instruct[ed] bidders on its use."  *Id.* at 1330.

The *Muniauction* court concluded that Thomson's interaction with the bidders did not rise to the level of direction or control, finding that "Thomson neither performed every step

34

of the claimed methods nor had another party perform steps on its behalf." *Id.*  The court also concluded that the jury instructions given by the district court had been incorrect and irrelevant to the issue of infringement.  The jury instructions had included the following:

> Consider whether the parties are acting jointly or together in relation to the electronic auction process.  Are they aware of each other's existence and interacting with each other in relation to the electronic auction process?  Is there one party teaching, instructing or facilitating the other party's participation in the electronic auction process?

*Id.* at 1329.  The Federal Circuit held that the plaintiff's claim failed because the plaintiff "ha[d] identified no legal theory under which Thomson might be vicariously liable for the actions of the bidders."  *Id.* at 1330.  The evidence did not show that "Thomson itself can be said to have performed every step of the asserted claims."  *Id.*  at 1329.

*BMC Resources* and *Muniauction* teach that when the actions of multiple parties combine to perform the steps of a claimed method, direct infringement requires that the "mastermind," the controlling party, exercise such direction or control over the entire process that it is vicariously liable for the actions of the other parties in performing steps of that process.  Providing data to another party, as in *BMC Resources*, does not support an inference of adequate "direction or control."  498 F.3d at 1381.  Controlling access to a system and providing instructions on using that system – "teaching, instructing or facilitating of the other party's participation" in the patented system – as in *Muniauction*, does not show adequate "direction or control."  532 F.3d at 1329.

- *Cross Medical Products*

35

In *BMC Resources,* the court cited with approval an earlier Federal Circuit decision, *Cross Medical Products v. Medtronic Sofamor Danek*, 424 F.3d 1293, 1311 (Fed. Cir. 2005), as an example of a case in which the direction or control standard was not satisfied despite evidence of significant instruction and direction of a third party in performing some of the claimed steps.  *Cross* involved a method for securing orthopedic surgical implants.  *Id.* at 1297.  The patent required an "anchor set being in contact with bone [, a step that] is absent until the screw and anchor are put in place during surgery."  *Id.* at 1311.  Medtronic, the accused infringer, produced orthopedic surgical implants.  Medtronic's representatives were present in operating rooms when implant surgeries took place and identified instruments for the surgeons installing the implants.  Cross Medical argued that by giving the surgeons such instruction, the Medtronic representatives in effect "join[ed] the anchor seat to the bone."  *Id*.  The court in *Cross* refused to attribute the acts of surgeons making the claimed apparatus in a surgical procedure to Medtronic, concluding that the surgeons were not acting as Medtronic's agents.  *Id*.  The court noted that there was no evidence of a contract between Medtronic and the surgeons.

In *Cross*, as in the present case, the alleged infringing activity required the combined actions of the defendant and a medical professional.  The issue was whether instructions from a representative of the defendant to the doctor were sufficient to attribute the medical professional's act to the defendant.   The Federal Circuit's conclusion in *Cross* that infringement did not occur is significant because in *Cross*, the defendant gave the doctor instructions on aspects of performing a medical procedure.  The *Cross* court did not provide

a detailed explanation for its conclusion that the surgeons were not agents of the defendant, but commented that "if anyone makes the claimed apparatus, it is the surgeons." *Id.* at 1311. The surgeons, not the Medtronic representatives, directed and controlled the medical procedures.  Although the representatives gave instructions on the instruments, that did not amount to controlling or directing the surgeons in their medical work.

• *District Court Cases After* BMC Resources

Two district court cases decided after *BMC Resources* found fact issues on the question of direction and control.  In *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007), the plaintiff sued for infringement of a prepaid calling card system that utilized a remote terminal to provide on-site activation and recharging of calling cards.  The accused infringer, AT&T, contracted with third parties to provide an activation platform and data terminals.  *Id.* at 577.  The plaintiff presented evidence that these third parties formatted data for AT&T in accordance with specifications provided by AT&T.  An AT&T representative had testified that one of these companies was acting "on behalf of" AT&T. *Id.* at 578.  Citing *BMC Resources*, the court denied AT&T's summary judgment motion, concluding that a fact issue existed as to whether AT&T controlled or directed the companies that provided the activation platform and data terminals.  *Id.*

In *Privasys, Inc. v. Visa Int'l*, No. 07-03257, 2007 WL 3461761, at *1 (N.D. Cal. Nov. 14, 2007), the plaintiff sued Visa for infringing a patented method for providing credit card security through an encrypted authentication code dynamically calculated with each transaction.  Visa allegedly had contracts with the banks and merchants that performed some

37

of the steps of the claimed method.  Visa provided instructions to these banks and merchants on how to carry out these steps.  *Id*. at *1.  The plaintiff moved to amend its complaint to claim infringement against Chase Bank and Wells Fargo Bank, which were members of Visa's business organization and which issued credit cards that were supported by the allegedly infringing arrangement.  The defendants opposed the plaintiff's motion on the ground that amendment would be futile because the plaintiff could not show that one party practiced each step or element of the claims in the plaintiff's patent.  The court permitted the amendment, concluding that it would not be futile because the relationship alleged between the banks and the other entities that carried out the additional steps in the patented method was stronger than the relationship at issue in *BMC Resources*:

> [P]laintiff has already indicated that it can produce precisely the type of evidence that had been absent in *BMC Resources*, i.e. that Visa 'provides instructions or directions regarding the use of' its payWave card to the merchants and banks involved in the process, and also that Visa has a 'contractual relationship' with 'the financial institutions.'  Both pieces of evidence tend to show that Visa exercised 'direction or control' over the customer–merchant interaction as well as over the banks, and thus 'perform[ed] or cause[d] to be performed each and every element of the claims.

*Id.* at *2.[9]

---

[9]  The suggestion in *Privasys* that the "direction or control" standard could be met by the fact "that Visa provides instructions or directions regarding the use of' its payWave card to the merchants and banks involved in the process," 2007 WL 3461761, at *2, is likely superseded by *Muniauction*'s holding that "one party teaching, instructing or facilitating the other party's participation" is not sufficient to show the necessary direction or control to support an inference of direct infringement.  532 F.3d at 1329.

A third district court case decided after *BMC Resources* concluded that there was no fact issue on the question of direction and control despite the existence of a contract.  In *Gammino v. Gellco Partnership*, 527 F. Supp. 2d 395, 396 (E.D. Pa. 2007), the patents at issue involved "processes and apparatuses for preventing telephones from making international calls."  Both patents described "means of recognizing and disconnecting phone calls commenced with dialing sequences that typically correspond to international calls."  *Id*. The accused infringer, Davel, owned and operated pay telephones throughout the country. Davel purchased services for these telephones from local providers.  One of the services Davel purchased was international call blocking.  *Id*.  The plaintiff asserted that Davel's purchase of international call blocking for use in its telephone system infringed the patents.

The court concluded that there was no infringement because Davel did not control or direct the step in question, or even understand how that step was carried out.  *Id*. at 398. There was "no evidence that Davel controlled how the local providers went about blocking international calls; again, the unrebutted testimony indicates that Davel *did not even know the providers' methods*."  *Id*. (emphasis added).  The court concluded that Davel did not perform the process and did not "direct another entity to do so."

The facts of *TCIP*, *Privasys,* and *Gammino* provide guidance into the types of relationships that might satisfy the *BMC Resources* direction or control standard.  *TGIP* emphasized that the "mastermind" provided precise specifications for the third party to follow in performing steps of the claimed method.  *Privasys* also emphasized performance according to specifications set by the "mastermind" and noted the relevance of a contractual

relationship.  *Gammino* emphasized that a contract by an accused infringer requiring a third party to perform some of the steps necessary to complete infringement is not sufficient to establish direction or control if the accused infringer does not control or "even know" how the third party performs those steps.

•  *District Court Cases After* Muniauction

District court cases decided after *Muniauction* emphasize that performance by a third party of claimed steps in a method patent according to the defendant's specific instructions, as opposed to performance prompted or facilitated by the defendant, can show the requisite direction or control for direct infringement.  In *Global Patent Holdings, LLC v. Panthers BRHC LLC*, No. 08-80013, 2008 WL 3833219 (S.D. Fla. Aug. 13, 2008), the plaintiff alleged infringement of a method patent for downloading material from a remote server in response to a query.  A website server and a remote computer user were required to complete the claimed method.  *Id.* at *1.  The plaintiff argued that the remote user's actions were directed or controlled by the defendant because the defendant supplied javascript programs and html-based web material to the user's machine that permitted the users to execute the defendant's program.  The plaintiff asserted that "[n]othing happens at the user's computer in connection with the method steps of [the patent] that is not a direct result of the execution of programs and website material supplied by [defendant's] website."  *Id.*  The court disagreed that this relationship could establish direction or control.  The court pointed to the fact that the remote user was not contractually bound to visit the website, that the user was not visiting the website within the scope of an agency relationship with the defendant, and

that the defendant was not otherwise vicariously liable for the acts of the remote user. *Id*. at **2-3. Citing both *BMC Resources* and *Muniauction*, the court concluded that "it appears that the level of 'direction or control' the Federal Circuit intended was not mere guidance or instruction in how to conduct some of the steps of the method patent. Instead, the court indicates that the third party must perform the steps of the patented process by virtue of a contractual obligation or other relationship that gives rise to vicarious liability in order for a court to find 'direction or control.'" *Id*. at *3.

In *Rowe Int'l Corp. v. Ecast, Inc*., No. 06-2703, 2008 WL 4133516 at **2-5 (N.D. Ill. Aug. 25, 2008), the court found a fact issue on direction or control. The defendant, Ecast, had contracts with third parties to perform certain steps of the claimed method, and these contracts provided specific instructions on how to perform these steps. The patent at issue involved a central management station that could distribute digital music to multiple jukeboxes. *Id*. at *1. Ecast had contracts with two parties, which it referred to as its "partners," to manufacture jukebox hardware compatible with the system. "[P]ursuant to these manufacturing contracts, [the partners] made jukeboxes specifically designed to operate with Ecast's network service," in accordance with technical specifications provided by Ecast. *Id.* at *4. The court concluded that there was evidence from which a jury reasonably could find that the other parties manufactured jukebox hardware subject to Ecast's "mastermind-level direction of participants in the alleged infringing activities." *Id*. at *4. The court specifically found that "[t]he indicia of direction and control go beyond what was present in *BMC Resources* [and] *Cross Medical Products*." *Id.*

41

*Global Patent* and *Rowe* make clear that to raise a fact issue as to direct infringement under the direction-or-control standard, the alleged infringer must cause third parties to perform steps of the claimed method in accordance with specific instructions and requirements. There was not only a contract in *Rowe*, but a contract that imposed specific instructions and requirements on how the third party was to perform the steps necessary for infringement. There was a contract between the accused infringer and service providers in *Gammino*, 527 F. Supp. 2d at 396, but the accused infringer did not control or direct how the providers performed the step necessary to complete infringement and did not know the providers' methods. The court concluded that the alleged infringer did not perform the process or direct another entity to do so. These cases make clear that for liability to attach, the defendant must direct or control the third party in its performance of the claimed steps of the patented method, such that the defendant could be vicariously liable for the third party's performance. *See id.; Global Patent*, 2008 WL 3833219, at *3; *Rowe*, 2008 WL 4133516, at **4-5. Giving instructions or prompts to the third party in its performance of the steps necessary to complete infringement, or facilitating or arranging for the third-party's involvement in the alleged infringement, are not sufficient.

### D.   Analysis

In the present case, the parties do not dispute that the contracts between the movants and the physicians or physician groups impose certain performance obligations on the physicians. The parties do dispute whether these contracts establish direction or control by the movants over the physicians' performance of the steps of the claimed method of using

videoconferencing in diagnosing remote patients, instructing on treating remote patients, and aiding in treating remote patients.

After *BMC Resources* and *Muniauction*, this issue requires analyzing whether under the contracts, the movants exercised control or direction over the physicians in performing the medical steps that are required to complete performance of the claimed method. One way to satisfy this standard, and the focus of the cases, is to ask whether the movants might be vicariously liable for the physicians' actions. *Muniauction*, 532 F.3d at 1330 ("[T]he control or direction standard is satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method."). The cases also generally refer to a contractual agency relationship between the "mastermind" and the third party performing some of the steps necessary to show infringement. As the court noted in *Muniauction*, "[i]n this case, Thomson neither performed every step of the claimed methods nor had another party perform steps on its behalf, and Muniauction has identified no legal theory under which Thomson might be vicariously liable for the actions of the bidders." *Id. BMC Resources* and *Muniauction* make clear that providing data to third parties to perform some of the claimed steps of the patented method, instructing these third parties on certain aspects of their performance, and facilitating or arranging for these third parties to perform the steps, generally do not establish the type of direction or control necessary for direct infringement. But the relationship between the movants and the physicians in this case is significantly stronger than was true of the relationship between Paymentech and the debit networks or

financial institutions in *BMC Resources* or between Thomson and the bidders in *Muniauction.* In those cases, there were no contracts between the asserted "mastermind" and the separate entities performing steps necessary to complete infringement. In the present case, the movants have contracts with the affiliated physicians. Under those contracts, the physicians agree to perform certain activities, such as conforming with generally accepted professional standards, being available for consults at certain times, and maintaining malpractice insurance. (Docket Entry No. 27 at 15-16). The physicians exercise their own professional judgment and discretion over how they perform any medical task. The issue is whether these contractual relationships suffice for "control and direction" of the physicians by the movants such that every step of the claimed method is attributable to the movants.

The contracts between Specialists On Call and the affiliated physician groups expressly provide that the physicians "shall be responsible for, and shall have authority, responsibility, supervision and control over, the provision of all Medical Services, and that all diagnoses, treatments, procedures and other professional Medical Services shall be provided and performed exclusively by the PC, through Medical Contractors acting within the scope of their respective licensure and exercising their independent medical judgment . . . ." These contracts further stipulate that Specialists on Call "is not competent or authorized to engage in any activity that constitutes the practice of medicine and that nothing contained in this Agreement is intended to authorize the Manager or the Manager Personnel to engage in the practice of medicine." (Docket Entry No. 22, Exs. 2A-C §§ 2.2.2, 5.1.3). The physicians are identified as independent contractors. (*Id.*, Exs. 2A-C §§ 5.2). The contracts

between Doctors Telehealth Network and its affiliated physicians state that "DTN shall have no right to interfere with the care or treatment Patient may give or prescribe for any Patient. Physician shall exercise his independent professional judgment consistent with accepted standards of medical practice and be subject to the same duties toward any Patient as exists generally between patients and physicians."  (*Id.*, Ex. 4A § 11(H)).

The contracts require the physicians to make themselves available to provide medical services at particular times and places,[10] to purchase liability insurance,[11] and to follow generally accepted professional standards.[12]  The movants arrange for the physicians to be compensated for their medical services and the movants are compensated for delivering

---

[10]  The contracts between Doctors Telehealth Network and the affiliated physicians, for example, provide that the physicians will "be able to provide Covered Services at such times as shall be scheduled in advance by DTN and agreed to by Physician" and that the physicians "shall provide DTN with a schedule of . . . availability not later than the 20th of the preceding month."  (Docket Entry No. 22, Ex. 4A §§ 2(B)(i), 2(C)).

[11]  The contracts between Tele-Med Dox and the affiliated physicians, for example, provide that "Physician shall require Physician to carry professional liability insurance in Units of not less than $250,000/$750,000.  Physician shall provide a certification to Tele-Med regarding each of the Physician insurance coverage on or before January 15 of each calendar year hereof."  (Docket Entry No. 22, Ex. 3A §6(b)).

[12]  The contracts between Specialists on Call and the affiliated physician group, for example, state that "[t]he PC shall provide Medical Services at the Premises in compliance at all times with ethical standards, laws, rules and regulations applicable to the operations of the PC and Medical Contractors.  The PC shall ensure that each Medical Contractor has all required licenses, approvals or other certifications to perform his or her duties . . . ."  (Docket Entry No. 22, Ex. 2A § 4.3).

telemedicine services.[13]  Emtel argues that the physicians are directed or controlled by the

movants because:

- Defendants require the physicians to provide medical services for compensation on behalf of Defendants.

- The contracts dictate that physicians shall perform medical services of a nature and quality that conform with generally accepted professional standards.

- The contracts include requirements for physician capacity, availability and scheduling.

- Defendants determine which of their affiliated physicians will provide medical services for a given telemedicine consult.

- Defendants–not physicians–contract with remote medical care facilities to provide outsourced diagnosis or treatment.

- Defendants require that physicians maintain malpractice insurance and/or provide notification to Defendants of any disciplinary action or medical malpractice claim.

- Specialists On Call requires physicians to provide medical services at SOC premises and to use reasonable efforts to prevent damage to the premises and telemedicine equipment.

- Tele-Med Dox requires physician assistance in collecting account receivables and in other unspecified duties as may arise from time to time.

- The Tele-Med Dox contracts stipulate that all patients are Tele-Med Dox's patients and not the physician's patients.  Tele-Med Dox retains authority to determine who will be accepted as patients.

---

[13]  The contracts between Tele-Med Dox and its affiliated physicians, for example, provide that "Tele-Med shall have exclusive authority to determine the fees . . . to be charged patients . . . . All sums paid by or on behalf of any patients of Tele-Med in the way of fees, salary, or otherwise for medical services rendered by Physician . . . shall remain the property of Tele-Med and shall be included in Tele-Med income . . . ."  The contracts further provide that the physicians will be paid monthly compensation as determined by a separate schedule to the contract.  (Docket Entry No. 22, Ex. 3A §§ 4(b), 3(b)).

- • The Doctors Telehealth Network contracts include provisions regarding the physicians' maintenance of medical records and requiring physicians to use Doctors Telehealth Network transcription services.

(Docket Entry No. 27 at 15-16).

Under a contract, a party may be both an agent and an independent contractor. A party "who contracts to act on behalf of another and [is] subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor." RESTATEMENT (SECOND) AGENCY § 14N (1958).[14] But a contracting party is not vicariously liable for the actions of an independent contractor unless that party controls the details of the independent contractor's work to such an extent that the contractor cannot perform the work as he chooses. *Indian Harbor Ins. Co. v. Valley Forge Ins. Group*, 535 F.3d 359, 364-65 (5th Cir. 2008) (citing *Koch Refining Co. v. Chapa,* 11 S.W.3d 153, 155 (Tex. 1999)). "[A] right of control requires more than a general right to order the work stopped or resumed, to inspect

_____

[14] The court in *BMC Resources* cited with approval RESTATEMENT (SECOND) OF AGENCY § 220, comment d. 438 F.3d at 1379. Comment e of that section states:

> e. *Independent contractors*. It is important to distinguish between a servant and an agent who is not a servant, since ordinarily a principal is not liable for the incidental physical acts of negligence in the performance of duties committed by an agent who is not a servant. . . . The important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results. Those rendering service but retaining control over the manner of doing it are not servants. They may be agents, agreeing to use care and skill to accomplish a result and subject to the fiduciary duties of loyalty and obedience to the wishes of the principal; or they may be persons employed to accomplish or to use care to accomplish physical results, without fiduciary obligations, as where a contractor is paid to build a house. An agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to such conduct as one who agrees only to accomplish mere physical results. For the purpose of determining liability, they are both "independent contractors" and do not cause the person for whom the enterprise is undertaken to be responsible . . . .

its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. . . .  There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."  *Koch Refining*, 11 S.W.3d at 155 (quoting RESTATEMENT (SECOND) OF TORTS § 414, cmt. c).  The control must also "relate to the activity that actually caused the injury." *Indian Harbor Ins. Co.*, 535 F.3d at 365 (quoting *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999)).

The aspects of contractual control that Emtel asserts as evidence of the movants' "direction or control" over the physicians' actions in performing some of the steps claimed in the '970 Patent do not show a basis for vicarious liability that would create a fact issue as to divided infringement.  Requiring physicians to purchase liability insurance, follow generally accepted professional standards, schedule times to be on call, and to use certain administrative steps, does not make the physicians the movants' agents so as to establish a basis for making the movants vicariously liable for the physicians' acts in diagnosing remote patients, instructing on their treatment, or aiding in their treatment.  These contractual provisions only set basic parameters for the physicians to follow that do not affect, much less control, how they exercise their judgment in performing the medical work that is required by Claim 1, steps (d) and (e) and Claim 4, step (f).

The issue raised in this case is one not directly addressed in *BMC Resources* or *Muniauction*.  There is a contractual relationship between the alleged "mastermind" and the third parties performing some of the claimed steps necessary for infringement.  But those

contracts do not provide a basis for the movants to be vicariously liable for the physicians'

conduct in performing the work that is necessary to infringe the '970 Patent.  The contracts

set some basic parameters for the physicians – including adhering to professional standards,

maintaining liability insurance, complying with schedules, using certain billing services –

but do not set limits on or assert control over the physicians' medical work, judgment, or

skill.  In *Cross Medical Products,* 424 F.3d at 1311, the court found that even when a

manufacturer's representative gave surgeons instructions on how to use the manufacturer's

instruments in surgery, that did not affect the physicians' independent medical judgments or

place them under the direction or control of the representative.  In the present case, the

movants are not involved at all in how the physicians diagnose, instruct in treatment, or aid

in treatment of, a patient.  The physicians, not the movants, perform and control these steps

of the claimed method.  Do the contracts nonetheless present a sufficient basis for finding

direct infringement on the ground that the physicians can be said to perform their medical

services as the movants' agents acting "on behalf of" the movants?

Agency cases in the medical context confirm that the relationship between the

movants and the physicians is not one of principal and agent and does not give rise to

vicarious liability.  As a general rule, doctors are not considered to be agents of the hospitals

with which they are affiliated, and hospitals are not vicariously liable for their doctors'

negligent acts or omissions.  *See Espalin v. Children's Med. Ctr. of Dallas*, 27 S.W.3d 675,

684 (Tex. 2000); *Berel v. HCA Health Servs. of Tex., Inc.*, 881 S.W.2d 21, 23 (Tex. 1994).

Because a hospital "is interested in only the results, and the contracting party independently

49

determines the details of the method by which the desired results are attained, an independent contractor relationship exists and the doctrine of respondeat superior has no application." *Berel*, 881 S.W.2d at 24 (citing *Gladewater Mun. Hosp. v. Daniel*, 694 S.W.2d 619, 621 (Tex. App.-Texarkana 1985, no writ)).   In determining whether a doctor is an agent of a hospital, courts may examine the extent to which the hospital has "the right to assign work" and to "direct, supervise, manage, or control the manner and details of the doctors' work." *Espalin*, 27 S.W.3d at 684; *see also Berel*, 881 S.W.2d at 24.   Contracts that require a doctor to comply with professional standards, or that set forth parameters for the doctor's work schedule, do not create an agency relationship between the physician and the affiliated hospital and do not expose the hospital to vicarious liability for the physicians' medical services. *See Chandler v. Cash*, 20 S.W.3d 69, 72 (Tex. App.–Texarkana 2000, pet. denied); *Drennan v. Cmty. Health Inv. Corp.*, 905 S.W.2d 811, 819 (Tex. App.–Amarillo 1995, writ denied); 42A Tex. Jur. 3d HEALING ARTS AND INST. § 220 (2008).[15]

The mere fact that there is a contract between the movants and the physicians or physician groups is not sufficient. *Cf. BMC Resources*, 498 F.3d at 1582 (noting that there was also no evidence in the record "*even of*" a contractual relationship between the defendant and the financial institutions that performed some of the steps claimed in the method patent). In *Rowe,* the court did find a fact issue as to divided infringement.   2008 WL 4133516, at

---

[15]  The evidence does not provide any basis to hold the movants vicariously liable for the actions of the physicians on a theory of ostensible agency.   There is no evidence in the record that the movants have taken any affirmative steps to hold themselves out as the employers of the physicians with whom they contract, as would be required to establish an ostensible agency. *See Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 949 (Tex. 1998); *Brownsville Med. Ctr. v. Gracia*, 704 S.W.2d 68, 74 (Tex. App.-Brownsville [13 Dist.] 1985).

**4-5.  There was a contract in *Rowe* between the "mastermind" and the third party who performed some of the steps of the claimed method.  But the court did not rely only on the presence of the contract and the fact that under the contract, the third party was working "on behalf" of the alleged infringer.  The court relied on the fact that the contract imposed specific instructions and requirements on how the third party is to perform the steps necessary for infringement.  *Id*.  There was also a contract between the alleged infringer and the third party that performed some of the steps necessary to complete infringement in *Gammino*, 527 F. Supp. at 398-99.  In that case, the court examined the substance of the contract and found that it did not support a finding of direct infringement because the alleged infringer did not control the third party's performance of those steps and did not even know how those steps would be performed.

These cases make clear that for liability to attach, the "mastermind" must so control the third party in its performance of the infringing steps that the third party does so as the defendant's agent.  The degree of control must be such that the defendant could be vicariously liable for the third party's performance.  *See Muniauction*, 532 F.3d at 1330 ("[T]he control or direction standard is satisfied in situations where the law would traditionally hold the accused direct infringer vicariously liable for the acts committed by another party that are required to complete the performance of a claimed method."); *Global Patent*, 2008 WL 3833219, at *3 ("[T]he third party must perform the steps of the patented process by virtue of a contractual obligation or other relationship that gives rise to vicarious liability in order for a court to find 'direction or control.'").  Making information available

to the third party, prompting the third party, instructing the third party, or facilitating or arranging for the third-party's involvement in the alleged infringement is not sufficient. *Muniauction*, 532 F.3d at 1329; *BMC Resources*, 498 F.3d at 1381; *Cross*, 424 F.3d at 1311; *Global Patent*, 2008 WL 3833219, at *3.

Under the relevant case law, and under traditional principles of agency, the evidence in the record is insufficient to establish that the movants direct or control the affiliated physicians in their performance of the work that is necessary to complete the performance of all the steps the method claimed in the '970 Patent. Because the movants cannot be said to perform each step of the '970 Patent, they do not infringe that patent. There is also insufficient evidence to establish that the movants and physicians directed or controlled each another, or that the physicians directed or controlled the movants. Just as there is no evidence that the movants participate in – let alone direct or control – the physicians' medical tasks in the process, there is no evidence that the physicians direct or control the movants' provision of a videoconferencing link.

This case may provide an example of a circumstance described in *BMC Resources,* in which the way the patent is drafted may allow parties to enter into "arms-length agreements" that lead to a finding of no direct infringement. 498 F.3d at 1381. In *BMC Resources*, the Federal Circuit noted that with the clarification it provided to the standard for undivided infringement, claims could be drafted to "capture infringement by a single party." 498 F.3d at 1381. This approach would call for drafting Claim 1(d) and (e), and Claim 4(f), to focus on one party – the videoconferencing-system provider, not the physician – "supplying

or receiving each element of the claimed process" rather than referring to different parties performing different acts within one claim. *Id.* As the movants argue, the elements of Claims 1 and 4 could be rewritten to refer to the telemedicine videoconferencing system provider *receiving* in a central medical videoconferencing station a physician's diagnosis of a medical condition of a patient in a satellite medical care facility, *transmitting* that diagnosis to the satellite medical care facility, *receiving* instructions provided by the physician to treat a patient at the satellite facility; and *transmitting* those instructions to the satellite medical facility. Similar changes could be made in Claim 4. Such changes would avoid divided infringement while preserving intact the system or method that the '970 Patent claims. But, as *BMC Resources* points out, such changes cannot be made by a court. *Id.*

The movants' motion for summary judgment of noninfringement is granted. But because the case law in this area is both new and uncertain, and because further guidance may be provided by the forthcoming *In re Bilski* opinion, the court may invite further briefing after that opinion issues.

## V.    Conclusion

The motion to dismiss  and for summary judgment based on statutory immunity are denied; the motion for summary judgment of noninfringement is granted.

SIGNED on September 30, 2008, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

53