**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| EMTEL, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-1798 |
| | § | |
| LIPIDLABS, INC, *et al*., | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

In 2007, Emtel filed this action alleging infringement of U.S. Patent No. 7,129,970 (the '970 Patent). (Docket Entry No. 1). In 2008, this court ruled that defendant Specialists on Call ("SOC")[1] had not infringed the '970 Patent claims. (Docket Entry No. 58; *Emtel, Inc. v. Lipidlabs, Inc.*, 583 F. Supp. 2d 811 (S.D. Tex. 2008)). This case was stayed while Emtel sought reissuance by the U.S. Patent and Trademark Office ("PTO"). (Docket Entries No. 61, 62). On April 12, 2011, the patent was reissued as U.S. Reissue Patent No. 42,288 (the '288 Patent). (Docket Entries No. 63, 64). The stay was lifted and Emtel amended its complaint to add claims that SOC infringed the '288 Patent. (Docket Entries No. 69, 86).

SOC has moved for summary judgment of noninfringement. (Docket Entry No. 98). This court held a hearing at which the parties presented oral argument on SOC's motion. (Docket Entry

---

[1] Emtel had also sued Lipidlabs, Inc., Doctors Telehealth Network, Inc., and Tele-Med Dox LLC, but SOC is the only active defendant remaining. Doctors Telehealth and Tele-Med Dox defaulted. (Docket Entry No. 114). Lipidlabs answered, (Docket Entry No. 12), but then did not respond to Emtel's motion for summary judgment, which the court granted, in part because of Lipidlab's deemed admissions, (Docket Entry No. 114).

No. 114).[2]  After the hearing, the court ordered limited additional discovery under Federal Rule of Civil Procedure 56(d) and set a schedule for supplemental submissions.  (*Id.*)  Both parties have supplemented their summary-judgment briefs and supporting materials.  (Docket Entries No. 117, 121, 122).

Based on a careful review of the pleadings; the motions, responses, and replies; the summary-judgment evidence; the arguments of counsel; and the applicable law, this court finds that the present record is inadequate to grant SOC's summary judgment motion.  SOC's motion is denied, for the reasons explained in detail below.

**I.     Background**

**A.     Emtel's '288 Patent**

The '288 Patent claims a method and system for a physician to provide emergency medical consultation to two patients at two remote locations at the same time.  The physician at a central location establishes video links to the two remote locations.  The physician receives video images and sound of both remote patients simultaneously.  The issue in this case is whether SOC has a system that a physician can use, and has used, to see and hear multiple patients at remote locations simultaneously, by videoconference.

_____

[2]  At the hearing, (Docket Entry No. 114), the court denied Emtel's motion for reconsideration of this court's 2008 judgment, (Docket Entry No. 76); granted Emtel's motion for entry of default against Doctors Telehealth and Tele-Med Dox, (Docket Entry No. 85); denied as moot Emtel's motion to replead or strike certain affirmative defenses, (Docket Entry No. 93); granted Emtel's motion for summary judgment against LipidLabs, (Docket Entry No. 105); denied SOC's motion to stay proceedings pending resolution of SOC's motion for summary judgment, (Docket Entry No. 100); and granted Emtel's Rule 56(d)(2) motion for a continuance to conduct specified additional discovery relevant to SOC's motion for summary judgment, (Docket Entry No. 103).

The '970 Patent had 8 claims.  The reissued '288 Patent has 19 claims.  (Docket Entry No. 99, Ex. 1, '288 Patent).  Claims 1–8 of the '288 Patent are either the same as the claims in the '970 Patent or have been narrowed in ways that do not affect the basis for this court's prior decision finding no infringement.  (*See id.*, col.10, l.57–col.12, l.54).[3]  Claims 1–8 of the '288 Patent are not infringed for the same reasons the court found they were not infringed in the earlier ruling.[4]  The '288 Patent claims at issue are claims 9–19.

The claims added in the '288 Patent fall into two categories.  Claims 9–14 are system claims, and Claims 15–19 are method claims.  These new claims are directed to a system or method of providing medical-consultation services to two remote facilities, with a physician at a central

---

[3]  Claims 4–8 are identical to the claims of the '970 Patent.  (Docket Entry No. 99, Ex. 1, col.11, l.50–col.12, l.54).  Independent claim 1 was changed slightly, but the changes do not impact the court's rationale for granting summary judgment.  (*Compare* Docket Entry No. 58, at 3–4, *with* Docket Entry No. 99, Ex. 1, col.10, l.57–col.11, l.38).  Claims 2–3 depend from claim 1, but were not otherwise changed when reissued.  (*See* Docket Entry No. 99, Ex. 1, col.11, ll.39–49).

[4]  The court based its ruling that SOC did not infringe in part on *BMC Resources Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2008), which held that direct infringement of a business-method claim occurs only when a single party "control[s] or direct[s]" the performance of all the steps or elements of a claimed method.  *Id.* at 1381.  On June 7, 2011, Emtel filed a motion for reconsideration on the ground that the United States Court of Appeals for the Federal Circuit had granted en banc rehearing in two divided-infringement cases, vacating the panel opinions that had relied on *BMC Resources*.  (Docket Entry No. 76, at 2–3 (citing *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 629 F.3d 1311, 1319–20 (Fed. Cir. 2010); *McKesson Techs. Inc. v. Epic Sys. Corp.*, No. 2010-1291, 2011 WL 1365548 (Fed. Cir. Apr. 12, 2011)).  On February 15, 2012, this court denied Emtel's motion.  (Docket Entry No. 114).  On August 31, 2012, the United States Court of Appeals for the Federal Circuit reversed *Akamai* and *McKesson* and overruled *BMC Resources* in part, holding that a party practicing some of the patented claims may be liable as an *indirect* joint infringer, even absent control or direction, if the party induces another to perform the remainder of the claims.  *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1305–06 (Fed. Cir. 2012) (en banc) (per curiam).  The Federal Circuit left undisturbed the standard for *direct* joint infringement, *id.* at 1307, which formed the basis of this court's prior grant of summary judgment as to claims 1–8, (Docket Entry No. 58, at 52).

location simultaneously viewing video sent from both remote locations.  All of the new claims require two audio-video communications links between a central medical facility and two remote facilities, so that a physician at the central facility can simultaneously watch the video from the two remote locations.

Claim 12 is representative:

12.    An arrangement for diagnosing emergency medical conditions of patients comprising:

a central medical video conferencing station;

first and second satellite emergency medical care facilities which are geographically remotely located from each other and from said central medical video conferencing station;

a first video camera located at said first satellite emergency medical care facility;

a second video camera located at said second satellite emergency medical care facility;

*a first video conferencing communication link established between said central medical video conferencing station and said first satellite emergency medical care facility* which enables a first video image from said first video camera of a first patient at said first satellite emergency medical care facility to be displayed at said central medical video conferencing station; and

*a second video conferencing communication link established between said central medical video conferencing station and said second satellite emergency medical care facility which enables a second video image* from said second video camera of a second patient at said second satellite emergency medical care facility *to be displayed at said central medical video conferencing station simultaneously with display of said first video image at said central medical video conferencing station*;

whereby medical conditions of said first and second patients can be evaluated substantially simultaneously by an emergency room physician at said central medical video conferencing station.

4

(*Id.*, col.13, l.50–col.14, l.14 (emphasis added)).

The italicized language, requiring the establishment (or, in claim 15, "use") of a videoconference link between the central facility and two remote facilities, is common to claims 9–19. These claims require that a physician at the central conference station be able to view video from both remote facilities simultaneously. (*Id.*, col.13, ll.29–32 (Claim 9); col.14, ll.11–14 (Claim 12); col.14, ll.59–67 (Claim 15); col.15, ll.26–col.16, ll.2 (Claim 18)). Emtel and SOC agree that "simultaneous" means "at the same time." (Docket Entry No. 112, at 8).

### B.    SOC

SOC is a telemedicine company that provides patients across the country with access to medical specialists. These specialists are available to consult with patients via telephone and videoconference. SOC's business is to support and facilitate patient access to medical diagnosis and treatment by specialized physicians who would otherwise likely be inaccessible to the patient. (Docket Entry No. 99, Ex. 2, SOC CEO Joe Peterson Decl., ¶¶ 5, 20). The specialists are in various areas, including neurology and psychiatry.

SOC submitted a declaration by David Gigas, its Director of Information Technology, describing the SOC system that allows its physicians to examine patients who are in a different location. SOC provides equipment to its specialists in a central location and to subscribing hospitals or medical clinics. Patients at these hospitals or clinics and their treating physicians use the equipment to communicate with the specialist. SOC uses standard, off-the-shelf, commercial computing and videoconferencing equipment. (Docket Entry No. 99, Ex. 4, Gigas Decl., ¶¶ 5, 8). The equipment consists of three main elements: a "hospital endpoint," located at the hospital or clinic; a "physician endpoint," at the same location as the SOC specialist; and a video-call server

SOC maintains. (*Id.*, ¶¶ 5–7). SOC preprograms the physician endpoints used by the SOC specialists with a "phonebook" of the SOC–member hospitals or clinics. (*Id.*, ¶ 17).

When an SOC-member hospital or clinic needs to speak to an SOC specialist, the hospital or clinic telephones the SOC call center and asks for a consultation. SOC contacts an appropriate specialist on call, such as a neurologist, and provides that specialist with the hospital or clinic contact information and basic information about the patient. Within 15 minutes of receiving a call to the SOC call center, a specialist will telephone the requesting hospital or clinic to begin the consultation. The specialist talks to the health-care provider at the remote facility and gathers the information the specialist believes is needed to provide medical advice. (*Id.*, ¶¶ 21–26).

If necessary, the specialist will ask to examine the patient by videoconference. To accomplish that, a nurse moves the hospital endpoint to the patient. (*Id.*, ¶¶ 26–27). The hospital endpoint consists of a video camera, videoconferencing equipment, and a computer. (*Id.*, ¶¶ 13–16). The physician endpoint, which also consists of computer and videoconferencing equipment, is with the specialist. (*Id.*, ¶¶ 9–12). The specialist will call the videoconferencing equipment at the remote hospital or clinic, generally using the physician endpoint preprogramed phone numbers, (*id.*, ¶ 27), to conduct the examination and communicate with the patient and referring physician.

Gigas explained in his declaration that the videoconferencing calls between a specialist using a physician endpoint and the treating physician using a remote hospital endpoint are direct, point-to-point calls between the specialist and a single remote hospital endpoint. (*Id.*, ¶¶ 18, 30). Gigas stated that each specialist consults with only one patient during the videoconference. The physician endpoint displays the video of the patient at the hospital endpoint. The hospital endpoint displays the video of the specialist conducting the consultation. (*Id.*, ¶ 30). Gigas asserted that there

has never been a videoconference using SOC equipment during which a specialist viewed video from two or more patients simultaneously.  (*Id.*, ¶ 31).

### C.      The Summary-Judgment Arguments and Evidence

SOC initially took the position that its system lacked the technical capability for simultaneous videoconferences with more than one patient.  When SOC's IT director, Gigas, explained that SOC's equipment was capable of "simultaneousness," SOC took the position that the evidence showed that it *had not* conducted simultaneous calls.  When an SOC document showing a time log of videoconferences suggested that simultaneous conferences had occurred, SOC explained that the log was not credible evidence.  SOC's position is that even if the summary-judgment evidence showed that its equipment was capable of infringing, SOC never used the equipment in an infringing way.  SOC argued that the absence of evidence showing infringing use entitles it to a judgment of noninfringement as a matter of law.

There is record evidence that SOC's system is technologically capable of simultaneous multiple-location, multiple-patient videoconferencing.  Emtel sent SOC requests for admission, asking SOC to admit that its system "allows simultaneous video and audio communication."  In response, SOC "admit[ted] that at least one of [its] video-conferencing communications systems is technically capable of simultaneous video and audio communication between a first location and at least two remote locations."  (Docket Entry No. 103, Ex. 12, SOC Responses & Objections, at 5 (Request for Admission No. 8)).  As further evidence of the SOC system's capability for "simultaneousness," Emtel pointed to language in SOC's marketing materials stating that it uses "the latest in video, networking and software technology," (Docket Entry No. 103, Ex. 1, SOC Website).  Emtel argued that the "latest" technology clearly allows simultaneous viewing of video feed from

multiple locations; indeed, this is a common feature of modern teleconferencing.  (Docket Entry No.

103, Ex. 2, Degioanni Decl., ¶¶ 10–12).  Emtel emphasized SOC's ability to provide a dual-monitor

or dual-physician-endpoint system, which would infringe claims 9–19 of the '288 Patent.[5]

---

[5]  SOC admitted that its system could display simultaneous video feed "on separate monitors."  (Docket Entry No. 103, Ex. 12, at 7 (Request for Admission No. 18))).  That admission is consistent with other evidence, including the following:

- an SOC brochure with an illustration showing SOC's "Neuro-Critical Care Center" with two TeleMD desktop systems, each with dual monitors, connecting the physician in the central location to remote medical facilities through the "Global Crossing Private Network."  (Docket Entry No. 103, Ex. 4, SOC Neuro-TeleMD Consortium Brochure)).
- Gigas answered a question asking whether SOC has "multi-site capability on any of its physician endpoints currently" with one word — "sure" — and explained that "[s]ome" SOC equipment can "handle a second call" simultaneously with a first call.  (Docket Entry No. 117, Ex. 20, Gigas Dep., at 22, 75, 83).
- SOC's Tandberg/Cisco MXP–series physician endpoints allow for "[c]alling two others at the same time."  (*Id.* at 70–72; Docket Entry No. 117, Ex. 23, Tandberg MXP Series User Guide, at 26).
- Some of SOC's equipment has Cisco TelePresence "multipoint" functionality, meaning that a physician endpoint can receive a single, multi-image feed consolidated from multiple locations.  (Docket Entry No. 117, Ex. 20, at 72–75; Docket Entry No. 103, Ex. 8, Cisco TelePresence Guide).
- SOC has five physician endpoints at its office.  (Docket Entry No. 117, Ex. 20, at 35).
- SOC's "Clinical Process Requirements/Policy," a two-page checklist for the SOC physician, states that an "on call" physician, when consulting on a patient, must indicate his status as "working" or "busy."  "Working" means the physician has "accepted and received" a "call," but "can still take new calls."  "Busy" means the physician "cannot accept calls at this time."  Emtel argues that the document suggests that the SOC physician can handle "additional" patients while "working" on an existing patient until he becomes too "tied up" to "take any more" patients. (Docket Entry No. 103, at 6–7 (quoting Docket Entry No. 103, Exs. 6–7)).
- SOC's "Tele-Physicians, P.C. Manual and Reference Guide" explaining "Video Conferencing Use" states that if the SOC physician "judges" that "he/she will be unable to 'see' the patient within SOC's designated time frames, he/she should request that a back-up physician take over the patient in question."  Emtel argued that this suggests the SOC physicians can handle patients at the same time or else no "judg[ment]" would be needed when receiving an additional patient — she would automatically go to the backup; for hospitals in California, SOC "does not

8

According to Emtel, the fact that SOC's equipment is "technically capable" of "simultaneousness" also supports an inference that its system has in fact been used for simultaneous videoconferences with more than one patient. SOC argued that "[i]t's irrelevant whether or not the system is technically capable of performing the steps under the law. . . . [E]ven if the system was technically capable of conducting simultaneous video conferences, it's legally irrelevant to the question of infringement." (Docket Entry No. 115, Tr. at 14). SOC's position was that it had never performed the claim element of simultaneousness or enabled its technology's capability for simultaneousness: "[W]e have never had simultaneous video conferences take place with more than one patient at a time within the scope of their claims." (*Id.* at 15).

Emtel again pointed to SOC's marketing materials as further support for an inference that simultaneous videoconferences have occurred. Emtel argued that simultaneous conferences are necessary for SOC to deliver what it promises in marketing materials. According to the marketing materials, SOC provides "real-time" telemedicine, including patient assessment, diagnosis, and treatment recommendations, to "emergency rooms on a 24/7 basis"; provides "on-demand" and "on-call" service; and gives its clients "unlimited access" to its specialists at all times. (Docket Entry No. 103, Ex. 1). SOC's marketing materials state that it is able to provide this level of service "because our video technology allows us to consolidate consult demand volumes from multiple hospitals in different geographic areas and distribute the demand across a concentrated set of SOC

---

have back-up," confirming that backup physicians need not exist. The manual also states that the SOC physician can manually call numbers and add numbers to the "Phone Book," although Gigas's declaration states that this is not possible. The 75-page, single-spaced, policy manual contains no statement that an SOC physician cannot simultaneously display patient images. (Docket Entry No. 103, at 7 (quoting Docket Entry No. 103, Ex. 7)).

physicians." (*Id.*)  Emtel argued that the only reasonable way to understand this description is that SOC physicians can meet all patient needs, even if more than one patient needs a particular expertise at the same time and only SOC specialist with that expertise is available.  (Docket Entry No. 103, at 5 (citing Docket Entry No. 103, Ex. 2, ¶¶ 10–11)).  If more than one patient urgently needs a particular type of specialist and only one is available, that specialist would have to conduct simultaneous consultations or SOC would be unable to provide the promised "unlimited" "on-demand" "on-call" service "24/7," with serious consequences to the patients needing the same specialized expertise.  (Docket Entry No. 103, Ex. 2, ¶¶ 10–11).

SOC's evidence that its physicians had not conducted simultaneous videoconferences with more than one patient included Gigas's declaration.  Gigas stated that:

> A video call has never been conducted such that the video feeds of more than one patient . . . have appeared on the Physician endpoint at the same time.

> . . . .

> Because the Hospital endpoint telephone numbers are pre-programmed into the Physician endpoint, it is not possible for an on-call specialist to initiate a video call with a unit other than an SOC authorized Hospital endpoint.

(Docket Entry No. 99, Ex. 4, ¶¶ 31, 33).  Emtel argued that these assertions about what the SOC physicians actually did were beyond the knowledge of an IT specialist who had never conducted an SOC physician teleconference.  (Docket Entry No. 103, at 11).

Emtel also argued that the SOC teleconferencing log showed actual simultaneous teleconferencing.[6]  For example:

---

[6] After this court permitted the parties to conduct limited additional discovery under Rule 56(d) and to supplement the record, the parties filed additional exhibits.  The added summary-judgment evidence included an "SOC Database of Consultation Times" and various digested excerpts from the log, (Docket Entry No. 117, Exs. 27–30); excerpts from depositions

- On March 25, 2010, Dr. Evan A., according to both the system record and his manually entered record, began a video consultation at 3:15 a.m. and then began an additional video consultation just five minutes later.

- On May 30, 2010, the same physician began two different video consultations at the exact same time, 7:55 p.m.

- On July 12, 2010, Dr. Colin M., who was conducting two different consultations that began only 12 minutes apart (1:19 and 1:31 p.m.), began the video component of those consultations at the exact same time.

- On July 28, 2010, Dr. Mason G.:

  - began one consultation at 1:22 p.m.
  - began a second consultation at 1:23 p.m.
  - started the second consultation's video at 1:24 p.m. and
  - started the first consultation's video at 1:3[5] p.m.

- The next day, Dr. Hillard S. began two different consultations five minutes apart (10:43 and 10:48 p.m.) and, a few minutes later, began the video for the two consultations at the exact same time (11:02 p.m.).

- Dr. Carlos V. performed a similar feat on December 14, 2010, beginning two different consultations eight minutes apart (10:49 and 10:57 p.m.) and beginning the video at the exact same time (11:00 a.m.).

(Docket Entry No. 117, at 5 (emphasis omitted) (citing Docket Entry No. 117, Ex. 27, at SOC003993, 4085, 4086, 4097, 4124, 4165)).

Because the time log entries did not show when consultations ended, they do not themselves prove which consultations, if any, were simultaneous. Emtel argued that "the obvious fact that consultations, particularly remote ones by video, take time" supports an inference that at least some of the consultations had been simultaneous:

---

of Gigas taken on December 1, 2011 and March 8, 2012, (Exs. 20–21); informational materials about SOC's teleconferencing equipment, (Exs. 22–25, 31); a declaration from Emtel's founder, Joseph Degioanni, (Ex. 32); an SOC media report, (Ex. 26); and Mayo Clinic research articles on neurology telemedicine, (Exs. 33–34).

> Given that a consultation's video portion should last at least 20
> minutes, individual SOC physicians, based on "Hosp Video Consult
> Date Time" (start of the actual video), had <u>1,718</u> simultaneous
> consultations — that is, the physician's next video began before that
> physician's last video ended.  If a consultation's video portion could
> be rushed into just 10 minutes, SOC still had 877 overlapping ones.
> Even if the video portion could be shortened to a mere five minutes,
> an SOC physician had simultaneous video 522 times.  Indeed, on 216
> occasions, an SOC physician began video at the exact same time —
> that is, the video portion of the consultations were not merely
> *occurring* at the same time, but were *started* at the same time.

(*Id.* at 4, 6 (citing Docket Entry No. 117, Ex. 27; Ex. 29, Simultaneous Video Consultations Based

on Start Times)).

SOC argued that although the logs show calls at the same time, they are not credible

evidence that SOC physicians conducted simultaneous video conferences:

> A first problem with the log is that the video consultation times on
> which Emtel relies do not have any hallmarks of accuracy and
> correctness.  Not only are these video consultation times entered
> manually by the physicians (when they are entered at all), they are
> often the result of a physician's "best estimate" of the start time
> because he has not entered the time contemporaneously with his start
> of a video call.

(Docket Entry No. 121, at 7 (citation omitted)).  SOC explained that many of the calls appeared to

originate at midnight because the computer system enters a midnight timestamp as a default if the

physician does not manually enter a start time.  (*Id.* at 8–9).  SOC also relied on declarations from

several of its physicians stating that they have not done simultaneous videoconferences with more

than one patient.  (*Id.* at 10 (citing Docket Entry No. 121, Ex. 7, Gigas Decl., ¶ 5; Exs. 8–14, ¶¶ 2,

7; Exs. 15–17, ¶ 2)).

SOC also argued that it is unreasonable to infer simultaneous videoconferencing of more

than one patient because that would violate SOC's internal policy that physicians conduct the calls

separately; the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No.

104-191, 110 Stat. 1936 (codified as amended in scattered sections of 18 U.S.C., 26 U.S.C., 29

U.S.C., and 42 U.S.C.), and the American Medical Association ("AMA") code of ethics, which

imposes a "duty to maintain confidentiality" of "any medical information revealed by a patient or

discovered by a physician in connection with the treatment of a patient." (*Id.* at 11 (citing

http://www.ama-assn.org/ama/pub/physician-resources/legal-topics/patient-physician-relationship-

topics/patient-confidentiality.page (last visited Oct. 30, 2012))).

     The court analyzes the parties' contentions and the summary-judgment evidence under the

applicable law.

## II.    The Applicable Legal Standards

### A.    Summary Judgment

     Summary judgment is appropriate if no genuine issue of material fact exists and the moving

party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the

burden of identifying those portions of the record it believes demonstrate the absence of a genuine

issue of material fact."  *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of proof at trial lies with the

nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out

to the district court — that there is an absence of evidence to support the nonmoving party's case."

*Celotex*, 477 U.S. at 325.  Although the party moving for summary judgment must demonstrate the

absence of a genuine issue of material fact, it does not need to negate the elements of the

nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation

omitted).  "'An issue is material if its resolution could affect the outcome of the action.'"  *DIRECTV,*

*Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).  "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response."  *Quorum Health Res., L.L.C. v. Maverick Cnty. Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim."  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted).  "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a "scintilla" of evidence.'"  *Little*, 37 F.3d at 1075 (citations omitted).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## B.    Patent Infringement

Patent infringement claims involve two analytic steps.  *Mars, Inc. v. H.J. Heinz Co.*, 377 F.3d 1369, 1373 (Fed. Cir. 2004); *Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*, 365 F.3d 1299, 1302 (Fed. Cir. 2004).  First, the court determines the meaning and scope of the asserted claims.  *Scanner*, 365 F.3d at 1302; *Novartis Pharm. Corp. v. Eon Labs Mfg., Inc.*, 363 F.3d 1306, 1308 (Fed. Cir. 2004).  Second, the claims as construed are compared to the allegedly infringing method or product to determine whether the claims encompass the accused method or product.  *Bai v. L&L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).  "To support a summary judgment of

14

noninfringement it must be shown that, on the correct claim construction, no reasonable jury could have found infringement on the undisputed facts or when all reasonable factual inferences are drawn in favor of the patentee." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1353 (Fed. Cir. 2001). When the movant and nonmovant agree on the meaning of the relevant term, a court need not formally construe the claims to decide a motion for summary judgment of noninfringement. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

"Infringement requires, as it always has, a showing that a defendant has practiced each and every element of the claimed invention. *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1380 (Fed. Cir. 2007) (citing *Warner-Jenkinson Co., Inc. v. Hilton Davis Corp.*, 520 U.S. 17, 40 (1997)), *overruled on other grounds*, *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1306 (Fed. Cir. 2012) (en banc). The patentee "may do so by relying on either direct or circumstantial evidence." *Linear Tech. Corp. v. Int'l Trade Comm'n*, 566 F.3d 1049, 1060 (Fed. Cir. 2009); *see also Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) ("[P]roof of inducing infringement or direct infringement [does not] require[] direct, as opposed to circumstantial evidence . . . . It is hornbook law that direct evidence of a fact is not necessary." (emphasis omitted)), *abrogated on other grounds*, *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008). Because dependent claims incorporate all the limitations of the independent claims from which they depend, if even one limitation of an independent claim is not met, there can be no infringement of its dependent claims. *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n.9 (Fed. Cir. 1989).

## III.    Analysis

The parties agree that the critical issue is whether record evidence supports a finding that SOC specialists have used the SOC system to videoconference with two patients simultaneously.[7] There is undisputed summary-judgment evidence that SOC's equipment is technically capable of simultaneous calling.  Emtel does not argue that this fact alone constitutes infringement.  Nor does Emtel argue that there is direct evidence that an SOC physician viewed video feeds of two or more patients simultaneously.  Instead, Emtel argued that SOC's technical capability for simultaneousness negates SOC's initial summary-judgment argument that its physicians cannot practice the simultaneousness element and, with other evidence, provides circumstantial evidence that SOC's physicians have conducted simultaneous videoconferencing with more than one patient at a time.

To bring a viable direct-infringement claim, Emtel must show at least one instance of infringement for every claim element.  *See BMC Res.*, 498 F.3d at 1378, 1380.  "In order to prove direct infringement, a patentee must either point to specific instances of direct infringement or show that the accused device necessarily infringes the patent in suit."  *Acco Brands, Inc. v. ABA Locks Mfrs. Co.*, 501 F.3d 1307, 1313 (Fed. Cir. 2007).  A patentee cannot prove direct infringement merely by showing that an accused system is capable of infringement unless the patent specifically claims the capability to do some thing.  *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 994 (Fed. Cir. 2009)).  Similarly, "[t]o infringe a method claim, a person must have practiced all steps of the claimed method."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1317 (Fed. Cir. 2009).   Emtel must show that SOC's system enabled simultaneous

---

[7] Because the parties agree that "simultaneous" means "at the same time," additional construction is necessary.  *See Vivid*, 200 F.3d at 803.

videoconferencing and, for Emtel's method claims, that simultaneous videoconferencing occurred. *See BMC Res.*, 498 F.3d at 1378, 1380; *Lucent*, 580 F.3d at 1317.

Emtel may rely on circumstantial evidence to raise a fact issue as to infringement. *See Linear*, 566 F.3d at 1060; *see also Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1364 (Fed. Cir. 2012) ("'Direct infringement can be proven by circumstantial evidence.'" (citing, *inter alia*, *Moleculon*, 793 F.2d at 1272)). Such evidence must show "more than the fact that the accused [technology is] merely 'capable of' infringing." *Toshiba*, 681 F.3d at 1366.

In *Toshiba*, an induced-infringement case, the Federal Circuit held that an inference of direct infringement was permissible "where an alleged infringer designs a product for use in an infringing way and instructs users to use the product in an infringing way." *Id.* at 1365; *see also Lucent*, 580 F.3d at 1318 (finding sufficient evidence to support a jury verdict of direct infringement because the accused infringer designed its products to practice the claimed invention and instructed its customers to use the accused product in an infringing way). The DVDs at issue in *Toshiba* came with instructions to enable an infringing mode. Some of the defendant's materials recommended against using the noninfringing mode so as to enable necessary interchangeability between disc formats. 681 F.3d at 1366. The *Toshiba* court distinguished cases like *Acco Brands*, where the evidence did not suggest actual infringement, because the products in *Acco Brands* "were sold only with instructions describing the non-infringing use," even though the patentee's expert in that case opined that "the infringing mode was the 'natural and intuitive way' to operate the device." *Id.* (citing 501 F.3d at 1312–13); *see also Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1328–29 (Fed. Cir. 2010) (holding that no evidence suggested actual infringing use when the infringing mode was disabled by default settings and the user manual described, but did not instruct, an infringing use).

These induced-infringement cases are instructive.  Emtel relies on circumstantial evidence of direct infringement, including evidence that SOC's video equipment is technically capable of showing two video feeds at a time, to show both that SOC's system is capable of simultaneous videoconferencing and that simultaneous videoconferencing has occurred.  Although this technical-capability evidence is not evidence of infringement in and of itself, *see Ball Aerosol*, 555 F.3d at 994, the record, viewed in the light most favorable to Emtel, shows "more than the fact that [SOC's equipment is] merely 'capable of' infringing," *Toshiba*, 681 F.3d at 1366.

Emtel pointed to evidence that physician consultations take a certain amount of time and that demand for consultation may outstrip the supply of available specialist physicians.  This evidence includes a declaration by Emtel's founder, Joseph Degioanni, that consultations take between 10 and 30 minutes, (Docket Entry No. 117, Ex. 32, Degioanni Decl., ¶ 9); a best-practice guideline from Mayo Clinic that consultations like SOC's take about 20 to 30 minutes, (Docket Entry No. 117, Ex. 33, Mayo Clinic Proceedings, at 56 tbl.3); and SOC's own marketing materials promising unlimited, on-demand service 24/7 with a total turnaround time of about 30 to 45 minutes, (Docket Entry No. 103, Ex. 1; Ex. 5, Tele-neurology Implementation Manual).  Emtel argued that viewing two patients at once was necessary for SOC to provide the service it promised.  As in *Toshiba*, in which the infringing mode of DVD recording created a functionality necessary to make the defendant's product compatible with other systems, Emtel's summary-judgment evidence supports an inference that simultaneous teleconferences were necessary to provide the specialist-to-hospital telemedicine practice that SOC promised.

Like the patentees in *Acco Brands* and *Fujitsu*, Emtel has not produced or identified evidence that SOC instructed its physicians to conduct infringing simultaneous calls.  *See Acco Brands*, 501

18

F.3d at 1312–13; *Fujitsu*, 620 F.3d at 1328–29. But unlike those cases, the evidence Emtel relied on shows that simultaneous calling was on occasion the necessary way — not merely the "natural [or] intuitive way" — for SOC physicians to use the teleconferencing equipment. *Acco Brands*, 501 F.3d 1312.

The time logs also support an inference that simultaneous calling in fact occurred. The logs showed that numerous videoconferences originated at the same time or so close in time that a physician could not have completed one consultation before beginning the next, as SOC claimed its doctors are required to do. This evidence would tend to show "more than the fact that [SOC's equipment is] merely 'capable of' infringing." *Toshiba*, 681 F.3d at 1366. This evidence, combined with undisputed evidence that SOC's system is capable of simultaneousness and an inference that SOC's services make simultaneousness necessary, reasonably supports an inference that "specific instances of direct infringement" occurred. *See Acco Brands*, 501 F.3d at 1313.

Emtel is only entitled to the inferences that may reasonably be drawn from the summary-judgment evidence. *See Anderson*, 477 U.S. at 255. SOC argued that it is unreasonable to infer direct infringement. SOC produced declarations from physicians who were shown on the call log as having multiple calls beginning at the same time. In these declarations, the physicians stated that they had never done two video consults at a time:

> There are 15 physicians shown in Emtel's exhibit 29 that have, according only to the time entries in the log, conducted simultaneous video conferences: Drs. Allen, DaSilva, Gasper, Gonzales, Grotta, Kalanithi, Kim, Linn, McDonald, Orwitz, Samuels, Schneider, Sharf, Villar, and Zechowy. The endpoints that Drs. Gasper, Gonzales, Grotta, Kim, Orwitz, Schneider, Sharf, and Zechowy use are not capable of conducting simultaneous video conferences. The other seven physicians have endpoints that are capable of "multisite" operation: Drs. Samuels, DaSilva, Villar, Linn, McDonald, Allen, and Kalanithi. However, each of these physicians avers under the penalty

> of perjury that each has never conducted simultaneous video
> conferences with more than one patient. These physicians also aver
> that even if they knew that their endpoint had this capability, they
> would have no idea how to use it. Moreover, SOC was able to obtain
> sworn declarations from [three] other physicians confirming that they
> too have never conducted simultaneous video conferences.

(Docket Entry No. 121, at 10 (citing Docket Entry No. 121, Exs. 8–17, Physician Decls.)).

This evidence does not, however, address other calls that, although not started at the same time, indicated a degree of temporal proximity that could be achieved only by viewing two patients at one time. For example, Dr. Muhammad Munir apparently started two videoconferences 3 minutes apart. (Docket Entry No. 117, Ex. 29, at 3). Dr. Omotola Hope started calls 15 minutes apart. (*Id.* at 12). Viewed in the light most favorable to Emtel, SOC's materials indicate that each videoconference could be expected to last about 30 minutes. One permissible inference is that Drs. Munir and Hope required less time than might otherwise be expected to complete these particular consultations. Another permissible inference is that these doctors viewed two patients at a time for at least some portion of each call. Viewed in the light most favorable to Emtel, it is reasonable to infer that although some videoconferences appear to start at the same time due to poor data entry, other videoconferences in fact occurred at the same time.

SOC also argued that conducting two calls at once would have violated its internal protocols, federal privacy laws, and the medical code of ethics. (Docket Entry No. 121, at 10–11). But the evidence as to SOC's internal policy is inconclusive. And the availability of simultaneous conferences on separate endpoint monitors — which Emtel asserted would also be infringing — does not appear to require the conclusion that HIPAA and doctor/patient confidentiality would be violated. Nor is there evidence that in an emergency situation, simultaneous conferences would be improper.

SOC's argument that Emtel has not shown specifically how SOC achieved simultaneousness — whether by multisite calling, by switching between feeds, by a consolidated, multisource feed, or by giving a physician more than one endpoint — is insufficient to grant summary judgment. Emtel is not required at this stage to produce evidence showing precisely how infringement occurred to avoid summary judgment of noninfringement.

The present record does not permit the court to conclude that SOC is entitled to summary judgment of noninfringement.[8]

## IV.   Conclusion

SOC's motion for summary judgment is denied.

SIGNED on October 31, 2012, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

---

[8] SOC also argued that Emtel could not establish liability based on the doctrine of equivalents. "The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki, Ltd.*, 535 U.S. 722, 733 (2002). A corollary rule, the "all elements" rule, requires that every element of a patent claim be present in an accused product to find patent infringement. *Warner-Jenkinson*, 520 U.S. at 29–30. SOC argued that there could be no equivalence because its system lacked two claim elements from claims 9–19: two established videoconference links and simultaneous viewing. (Docket Entry No. 98, at 13). The court need not address this argument in light of the conclusion that the record is insufficient to find an absence of direct infringement.