**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

EMTEL, INC.,                     §
                                 §
                  Plaintiff,     §
                                 §
v.                               §          CIVIL ACTION NO. H-07-1798
                                 §
LIPIDLABS, INC, *et al*.,        §
                                 §
                  Defendants.    §

**MEMORANDUM AND OPINION**

This patent-infringement case involves videoconferencing technology that allows physicians to provide medical advice to patients in other locations. Emtel's U.S. Reissue Patent No. 42,288 (the '288 Patent) claims a method and system for a physician to observe and consult with patients at remote locations using a mobile cart equipped with a monitor and a remotely controlled video camera. Emtel alleges that Specialists on Call ("SOC") infringed this patent.[1]

After this suit was filed, the patent originally at issue was reissued as the '288 Patent. The '288 Patent was subject to an ex parte reexamination proceeding. The U.S. Patent and Trademark Office ("PTO") confirmed the patentability of the '288 Patent in 2014. SOC argues that although the parties stipulated before the reexamination that "simultaneous" and "simultaneously" meant "at the same time," these terms were narrowed during the reexamination proceedings.

The court held a *Markman* hearing on April 23, 2015, at which counsel presented argument

---

[1]  Emtel had also sued Lipidlabs, Inc., Doctors Telehealth Network, Inc., and Tele-Med Dox LLC, but SOC is the only active defendant remaining. Doctors Telehealth and Tele-Med Dox defaulted. (Docket Entry No. 114). Lipidlabs answered, (Docket Entry No. 12), but then did not respond to Emtel's motion for summary judgment, which the court granted, in part because of Lipidlab's deemed admissions, (Docket Entry No. 114).

1

in support of their competing constructions of these terms.  (Docket Entry No. 171).  The parties have asked the court to construe "simultaneous" and "simultaneously" before other disputed terms. The issue addressed in this Memorandum and Opinion is whether "simultaneous" and "simultaneously" mean "at the same time," as the parties originally agreed, or whether Emtel narrowed the terms during the reexamination proceedings.  Based on the parties' claim-construction briefing, the arguments of counsel, the record, and the applicable law, the court agrees with Emtel that "simultaneous" and "simultaneously" mean "at the same time."

The reasons for this ruling are explained below.

I.      **Background**

A.      **Emtel's '288 Patent**

The '288 Patent claims a method and system for a physician to provide emergency medical consultation to two or more patients at two or more remote locations.  A "mobile emergency center cart" with a video camera and a monitor is placed within a medical facility.  The physician is based at a central location and receives video images and sound of the remote patients "simultaneously." The physician can communicate with patients, control the video cameras remotely, and make diagnoses or recommend treatments.

B.      **Specialists on Call**

SOC is a telemedicine company that provides patients across the country with access to medical specialists.  These specialists are available to consult with patients by telephone and videoconference.  SOC's business is to support and facilitate patient access to medical diagnosis and treatment by specialized physicians who would otherwise be unavailable to that patient.  (Docket Entry No. 99, Ex. 2, Joe Peterson Declaration at ¶¶ 5, 20).

2

SOC provides equipment to its specialist physicians at a central location, as well as in subscribing hospitals or medical clinics.  Patients at these hospitals or clinics and their treating physicians use the equipment to communicate with the specialist, who is at a different location. SOC uses commercially available off-the-shelf computer and videoconferencing equipment. (Docket Entry No. 99, Ex. 4, David Gigas Declaration at ¶¶ 5, 8).  The equipment has three main elements: "hospital endpoint" equipment that is located at the hospital or clinic; "physician endpoint" equipment that is at the same location as the SOC specialist; and a videocall server that SOC maintains at its office.  (*Id.* at ¶¶ 5–7).

When an SOC-subscribing hospital or clinic wants to speak to an SOC specialist, the hospital or clinic telephones the SOC call center, which contacts the appropriate specialist on call.  The specialist in turn contacts the requesting hospital or clinic to gather information about the patient. The specialist uses the videoconferencing equipment to examine the patient and communicate questions and the diagnosis or treatment to the patient and the health-care professionals treating that patient at the hospital or clinic.

### C.    The Procedural and Factual Background

In 2007, Emtel filed this suit alleging that SOC and others infringed U.S. Patent No. 7,129,970 (the '970 Patent).  (Docket Entry No. 1).  In 2008, this court ruled that SOC had not infringed the '970 Patent.  (Docket Entry No. 58).  This suit was stayed while Emtel sought reissuance by the PTO.  (Docket Entry Nos. 61, 62).  When the proceedings ended, Emtel surrendered the '970 Patent, which the PTO reissued as the '288 Patent in April 2011.  (Docket Entry Nos. 63, 64).  The court lifted the stay and Emtel filed an amended complaint alleging that SOC infringed the '288 Patent.  (Docket Entry Nos. 69, 86).

The '970 Patent had 8 claims.  The reissued '288 Patent has 19 claims.  (Docket Entry No. 163, Emtel Ex. 20, '288 Patent).  Claims 1 to 8 of the '288 Patent are substantially the same as the'970 Patent claims.  (*See id.*, col. 10, l. 57–col. 12, l. 54).[2]

The claims added in the '288 Patent are system claims (Claims 9 to 14) and method claims (Claims 15 to 19).  These new claims are directed to a system and method of providing medical-consultation services to two or more remote facilities, with a physician at a central location simultaneously viewing video sent from the remote locations.  All of the new claims require two or more audio-video communications links between a central medical facility and two or more remote facilities, so that a physician at the central facility can simultaneously watch the videos from the remote locations.  The '288 Patent claims at issue are Claims 9 to 19.

In the *Markman* hearing held in February 2012, the parties argued the proposed constructions of "geographically remote," "video-conferencing communication link," "station," "said medical care giver," and "station."  (Docket Entry No. 114).  The parties agreed that "simultaneous" and "simultaneously" meant "at the same time."  (*Id.*).

The court denied SOC's motion for summary judgment of noninfringement in October 2012, finding that the record showed that SOC's system was technologically capable of simultaneous multiple-location, multiple-patient videoconferencing, and that some evidence showed that simultaneous calls had occurred.  (Docket Entry No. 131).

On November 26, 2012, after the *Markman* hearing but before the court construed the

---

[2]  Claims 4 to 8 are identical to the claims of the '970 Patent.  (Docket Entry No. 99, Ex. 1, col. 11, l. 50–col. 12, l. 54).  Independent Claim 1 was changed slightly in ways that do not affect this court's rulings. (*Compare* Docket Entry No. 58 at pp. 3–4, *with* Docket Entry No. 99, Ex. 1, col. 10, l. 57–col. 11, l. 38). Claims 2 to 3 depend on Claim 1, but were not otherwise changed when reissued.  (*See* Docket Entry No. 99, Ex. 1, col. 11, ll. 39–49).

4

disputed claim terms, the PTO granted a request for ex parte reexamination of the '288 Patent. That request was filed by a defendant in another case in which Emtel claimed infringement of the reissued Patent. (Docket Entry No. 135). The court stayed this case pending the PTO's reexamination. (Docket Entry No. 136, 140). The PTO initially rejected all of the claims as anticipated under 35 U.S.C. § 102(b) or as obvious under 35 U.S.C. § 103(a), in light of prior-art publications describing telemedicine systems and videoconferencing technology. (Docket Entry No. 160, Exs. 3, 7). In January 2014, on reconsideration, the PTO confirmed the patentability of all claims without amendment. (Docket Entry No. 160, Ex. 9). The stay was lifted when the reexamination concluded.

The issue addressed in this Memorandum and Opinion is the proper claim construction of "simultaneous" and "simultaneously." The parties agreed before the reexamination that the terms meant "at the same time." SOC argues that Emtel disclaimed prior art during the reexamination proceedings, narrowing the claims and the meaning of "simultaneous" and "simultaneously." (Docket Entry No. 160). SOC contends that the proper construction is that "images of at least two patients are displayed on the same screen at the same time, in what is known as continuous presence display and which is reminiscent of Hollywood Squares." (*Id.* at p. 15). Emtel contends that the reexamination proceedings did not change the parties' agreed meaning of "simultaneous" and "simultaneously" as "at the same time." (Docket Entry Nos. 112, 163).

## II.    The Applicable Legal Standard

The "'claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "[T]he construction of a patent, including terms of art within its claim, is exclusively within the

province of the court." *Markman*, 517 U.S. at 372.  Claim terms are "'generally given their ordinary and customary meaning,'" which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  *Phillips*, 415 F.3d at 1312–13 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  A court is to read the patent from the vantagepoint of a person with ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1313.  That is a person who will "'read the words used in the patent documents with an understanding of their meaning in the field, and [has] knowledge of any special meaning and usage in the field.'"  *Id.* (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)); *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) (cautioning courts not to interpret claim terms "in a vacuum" (quotation omitted)).

When the words used in the context of the surrounding claim language make the ordinary meaning readily apparent, claim construction "involves little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.  The court looks first "to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention," *Vitronics*, 90 F.3d at 1582, and construes the claim terms in the context of the surrounding claim language.  *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms."); *accord Lexion Medical, LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011).

If the meaning is unclear, the court reviews "the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, the specification and, if in evidence, the prosecution history."  *Vitronics*, 90 F.3d at 1582; *see also Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed.

6

Cir. 2011) ("[T]he role of a district court in construing claims is . . . to give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence.").

Courts review the "specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics*, 90 F.3d at 1582.  The Federal Circuit has repeatedly stated that "claims 'must be read in view of the specification, of which they are a part.'" *Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d 967, 979 (Fed. Cir. 1995)).  The specification, a "concordance for the claims," *id.* (quoting *Autogiro Co. of Am. v. United States*, 384 F.2d 391, 397–98 (Ct. Cl. 1967)), is the "best source for understanding a technical term," *id.* (quoting *Multiform Desiccants*, 133 F.3d at 1478).[3]  "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* (citing *Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343–44 (Fed. Cir. 2001)); *see also Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (explaining that claim construction may deviate from the ordinary and customary meaning of a disputed term only if (1) a patentee sets out a definition and acts as his own lexicographer, or (2) the patentee disavows the full scope of a claim term either in the specification or during prosecution).

"'The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'" *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Società per Azioni*, 158 F.3d, 1243, 1250 (Fed. Cir.

_____

[3] *See also Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1360 (Fed. Cir. 2004) ("In most cases, the best source for discerning the proper context of claim terms is the patent specification wherein the patent applicant describes the invention.").  When the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. . . . the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)).

1998)).  "There is a fine line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011).  Courts must "capture the scope of the actual invention, rather than strictly limit the scope of claims to disclosed embodiments or allow the claim language to become divorced from what the specification conveys is the invention." *Id.*

"[A] court 'should also consider the patent's prosecution history, if it is in evidence.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980); *see also Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) ("[T]he specification is the primary source for determining what was invented and what is covered by the claims, elucidated if needed by the prosecution history.").  The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* (citing *Vitronics*, 90 F.3d at 1582–83).  The prosecution history includes "all express representations made by or on behalf of the applicant to the examiner to induce a patent grant, or . . . to reissue a patent. . . . includ[ing] amendments to the claims and arguments made to convince the examiner that the claimed invention meets the statutory requirements of novelty, utility, and nonobviousness." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985); *see also Sanofi-Aventis Deutschland GmbH v. Genentech, Inc.*, 473 F. App'x 885, 888 (Fed. Cir. 2012) ("We have held that an otherwise broadly defined term can be narrowed during prosecution through arguments made to distinguish prior art.") (citing *Phillips*, 415 F.3d at 1317 ("The prosecution history . . . consists of the complete record of the proceedings before the PTO and includes the prior

art cited during the examination of the patent.")).

"The doctrine of prosecution disclaimer is well established in Supreme Court precedent, precluding patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003); *see also SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2005). The doctrine applies even if the disclaimers were not necessary to make the invention patentable. *See Uship Intellectual Props., LLC v. United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013) ("We find no support for [the] proposition that prosecution disclaimer applies only when applicants attempt to overcome a claim rejection. Our cases broadly state that an applicant's statements to the PTO characterizing its invention may give rise to a prosecution disclaimer."); *cf. Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1583 (Fed. Cir. 1995) ("Estoppel extends beyond the basis of patentability. . . . Clear assertions made during prosecution in support of patentability, whether or not actually required to secure allowance of the claim, may also create an estoppel.") (citing *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165 (Fed. Cir. 1993)).[4] The doctrine does

_____

[4] "There is a clear line of distinction between using the contents of the prosecution history to reach an understanding about disputed claim language and the doctrine of prosecution history estoppel which 'estops' or limits later expansion of the protection accorded by the claim to the patent owner under the doctrine of equivalents when the claims have been purposefully amended or distinguished over relevant prior art to give up scope. . . . [T]he two uses of the prosecution history must not be confused." *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 862 (Fed. Cir. 1991) (citations and internal quotation marks omitted); *see also Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358–59 (Fed. Cir. 2001) (distinguishing the two); *Spectrum Int'l Corp. v. Sterilite Corp.*, 164 F.3d 1372, 1378 n.2 (Fed. Cir. 1998) (same). "Just as prosecution history estoppel may act to estop an equivalence argument under the doctrine of equivalents, positions taken before the PTO may bar an inconsistent position on claim construction." *Ballard Med. Prods.*, 268 F.3d at 1359 (quoting *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1457 (Fed. Cir. 1998)) (alteration omitted). When the accused infringer argues that the prosecution history results in a narrowing of a claim's scope, there is no difference, and the Federal Circuit has refused to reverse based on references to estoppel. *See id.* at 1359 ("Because the substance of the district court's analysis was sound, we disregard the fact that the court used the term 'prosecution history estoppel' in an unconventional manner."); *Biodex Corp.*, 946 F.2d at 862–63 (observing that "Biodex is technically correct in asserting that the doctrine of prosecution history estoppel is 'irrelevant' to determination of literal claim

not apply "where the alleged disavowal of claim scope is ambiguous." *Omega Eng'g*, 334 F.3d at 1324; *see also id.* at 1325 ("[W]e have required the alleged disavowing statements to be both so clear as to show reasonable clarity and deliberateness and so unmistakable as to be unambiguous evidence of disclaimer.") (citations omitted). Only when "the patentee has unequivocally disavowed a certain meaning to obtain his patent [does] the doctrine of prosecution disclaimer attach[ ] and narrow[ ] the ordinary meaning of the claim congruent with the scope of the surrender." *Id.* at 1324.

Courts may also "rely on extrinsic evidence, which 'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Phillips*, 415 F.3d at 1317 (quoting *Markman*, 52 F.3d at 980). Although extrinsic evidence "'can shed useful light on the relevant art,' it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Zircon Corp. v. Stanley Black & Decker, Inc.*, 452 F. App'x 966, 972–73 (Fed. Cir. 2011) (quoting *Phillips*, 415 F.3d at 1317). Extrinsic evidence is "in general . . . less reliable than the patent and its prosecution history" because it is "not part of the patent" and was not created at the time of the patent's prosecution; "extrinsic publications may not be written by or for skilled artisans"; and expert reports and testimony created at the time of litigation may "suffer from bias not present in intrinsic evidence." *Phillips*, 415 F.3d at 1318. A court must exercise "sound discretion" in admitting and using extrinsic evidence. *Id.* at 1319; *see also Seattle Box Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed. Cir. 1984) ("A trial judge has sole discretion to decide whether or not [s]he needs, or even just desires, an expert's assistance to understand a patent. We will not disturb that discretionary decision except in the clearest case.").

---

scope" but upholding the district court because prosecution history is relevant to claim interpretation) (citation omitted).

"[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319.  Although a court may consider extrinsic evidence, it must not relegate the intrinsic evidence to a mere "check on the dictionary meaning of a claim term."  *Id.* at 1320–21 (noting that relying on dictionaries "too often" causes "the adoption of a dictionary definition entirely divorced from the context of the written description").  "The sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law."  *Id.* at 1324 (citing *Vitronics*, 90 F.3d at 1582).

These claim-construction tools are applied to the record in this case.

## III.    Analysis

### A.    Claim Language

Claim 12 is representative of the claims at issue, Claims 9 to 19.  Claim 12 states:

12.    An arrangement for diagnosing emergency medical conditions of patients comprising:

a central medical video conferencing station;

first and second satellite emergency medical care facilities which are geographically remotely located from each other and from said central medical video conferencing station;

a first video camera located at said first satellite emergency medical care facility;

a second video camera located at said second satellite emergency medical care facility;

*a first video conferencing communication link established between said central medical video conferencing station and said first satellite emergency medical care facility* which enables a first video image

11

from said first video camera of a first patient at said first satellite emergency medical care facility to be displayed at said central medical video conferencing station; and

*a second video conferencing communication link established between said central medical video conferencing station and said second satellite emergency medical care facility which enables a second video image* from said second video camera of a second patient at said second satellite emergency medical care facility *to be displayed at said central medical video conferencing station simultaneously with display of said first video image at said central medical video conferencing station*;

whereby medical conditions of said first and second patients can be evaluated substantially simultaneously by an emergency room physician at said central medical video conferencing station.

('288 Patent at col. 13, l. 50–col. 14, l. 14 (emphasis added)).

The italicized language, requiring the establishment (or, in Claim 15, "use") of a videoconference link between the central facility and two remote facilities, is also in Claims 9 to 19. These claims require that a physician at the central conference station be able to view video from both remote facilities "simultaneously." (*Id.* at col. 13, ll. 29–32 (Claim 9); col. 14, ll. 11–14 (Claim 12); col. 14, ll. 59–67 (Claim 15); col. 15,  ll. 26–col. 16, ll. 2 (Claim 18)).

## B.    Ordinary Meaning

Before the reexamination proceedings, the parties agreed that "simultaneous" and "simultaneously" meant "at the same time."  (Docket Entry No. 114).  The court finds that "at the same time" is the ordinary meaning of these claim terms.  (*See* Docket Entry No. 163, Emtel Ex. 23, American Heritage Dictionary Online (defining "simultaneous" as "happening, existing, or done at the same time)); *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1324 (Fed. Cir. 2004) (stating that the plain meaning of "simultaneously" is "in a simultaneous manner: at the same time: concurrently" (emphasis omitted))).  That ordinary meaning supports Emtel's proposed construction,

12

and the context of the surrounding words is consistent.

The patent specifications also support this construction.  They describe:

- a "plurality of video monitors," ('288 Patent, col. 10, ll. 14–15);

- that are "simultaneously inspected," (*id.* at col. 8, ll. 49–50);

- and "monitored by a medical practitioner," (*id.* at col. 10, ll. 23–24);

- who can examine the videos either "simultaneously or selectively," (*id.* at col. 8, ll. 52–53).

The specifications do not mention "continuous presence," much less "Hollywood Squares."  The specifications suggest that all of the videos should be displayed at the same time and that more than one monitor may be used to display the videos.  (*Id.*, col. 10, ll. 14–16).

The use of the disputed terms in other parts of the '288 Patent also favors Emtel's construction.  "[T]he same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims."  *Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001).  "If possible, this court construes claim terms 'in a manner that renders the patent internally consistent.'"  *Frank's Casing Crew v. Weatherford Int'l*, 389 F.3d 1370, 1377 (Fed. Cir. 2004) (quoting *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379–80 (Fed. Cir. 2001)).  The parties agree that several '288 Patent claims use the terms "simultaneous" and "simultaneously" to mean "at the same time."  Claim 3 refers to "simultaneously controlling said video-conferencing system" at multiple medical care facilities.  ('288 Patent, col. 11, ll. 47–49).  Claim 12 recites that patients can be "evaluated substantially simultaneously."  (*Id.*, col. 14, l. 12).  SOC's proposed construction of the same word is different.  SOC justifies its construction by

arguing that it would apply only when "simultaneous" or "simultaneously" refers to "viewing" or "display." (Docket Entry No. 171 at pp. 16–17). SOC bases this argument on Emtel's disclaimers in the reexamination proceedings, allegedly made to overcome the PTO's initial rejection of the patent.

### C.    Disclaimer Based on the Reexamination Proceedings

SOC argues that in the reexamination proceedings, Emtel disclaimed the broad construction of "simultaneous" and "simultaneously" that the parties had agreed to earlier in this litigation. The PTO opened those proceedings based on the finding that prior art raised substantial questions of patentability. (Docket Entry No. 160, Ex. 3 at p. 2). The PTO found that the prior art taught "simultaneous displaying" of first and second images on first and second monitors, "simultaneous video-conferencing connections," "simultaneous display" of video images, and "simultaneous calls." (Docket Entry No. 160, Ex. 3 at pp. 14, 15, 21, 22).

The PTO relied primarily on a 1997 article by Dr. Michael Ricci, Dr. Peter Callas, and William Montgomery about a Vermont telemedicine program.[5] (Docket Entry No. 160, Ex. 2, "The Vermont Telemedicine Project: Initial Implementation Phases," *Telemedicine Journal*, Vol. 3, No. 3, 1997, Ricci *et al.*). The Ricci article described a telemedicine system that allowed videoconferencing between several rural hospitals and the University of Vermont hospital to provide care to patients at remote facilities. (*Id.* at p. 197). The project used "VTEL MCU-II" hardware, which could handle up to six simultaneous video calls through "bridging." (*Id.* at p. 200). The PTO initially rejected Emtel's patent in March 2013 on the ground that the Ricci system disclosed the simultaneous viewing or display of video images. (Docket Entry No. 160, Ex. 3 at pp. 12–15,

---

[5] The PTO also relied on WO 1999/12349 ("Hendricks") and U.S. Patent No. 5,544,649 ("David").

23–25, 30–31).

Emtel objected to the PTO's finding that substantial questions of patentability existed that undermined the patent. Emtel argued that Ricci did not "teach or suggest a video conferencing system that supports simultaneous display or viewing of images or video images," (Docket Entry No. 160, Ex. 4 at pp. 7, 16), and that the VTEL MCU-II system did not support "simultaneous display of images or video images." (*Id.* at pp. 5–6). Emtel contrasted the "multipoint" hardware that Ricci's VTEL MCU-II system used[6] with "continuous presence" hardware, which provided "the ability to see four independent sources of video in one view." The Buyer's Guide described "continuous presence" as " an optional conference view where participants view other sites in one of four windows displayed simultaneously—think 'Hollywood Squares.'" (*Id.* at p. 5).

Emtel submitted an affidavit from Kelvin James, an inventor of the '970 Patent who claimed to be knowledgeable about the state of the art in telemedicine and videoconferencing systems in 1997. James stated that Ricci's multipoint system used "voice activated switching," meaning that instead of displaying images from all video sources at the same time, it displayed only one image from a single video source, the one with the most active audio component. (Docket Entry No. 160, Ex. 6, James Declaration at ¶¶ 7–10). James stated that when Ricci was published, the only type of switching hardware that permitted simultaneous viewing and display of video images was "continuous presence." (*Id.*). He explained that "a Video Conferencing system in 1995–1997 [when the system Ricci described was implemented] that lacked 'continuous presence' video display ability would not be capable of simultaneous display of multiple video images from different input

---

[6] "Multipoint" hardware "permits three or more remote sites to see and hear one another without perceptible delay." (Docket Entry No. 160, Ex. 5 at p. 41). But although all of the audio sources are heard at once, only one video image is displayed. (Docket Entry No. 160, Ex. 4 at p. 5).

sources." (*Id.*).  James also concluded that "because the MCU-II lacked 'continuous presence' video display ability, . . . the video-conferencing system described in the Ricci article was not capable of simultaneous display of multiple video images from different input sources."

Emtel also referred to the Buyer's Guide, a publication that criticized the VTEL MCU-II, that the Ricci system used, for its inability to display multiple video streams at the same time.  The Buyer's Guide recommended that companies implementing videoconferencing systems use a bridging hardware that permitted continuous-presence technology.  (Docket Entry No. 160, Ex. 5, Perey, Christine, "Buyer's Guide: Video Face-off," Network World magazine, May 19, 1997, at p. 44).  The Buyer's Guide described continuous-presence technology as providing"the ability to see four independent sources of video in one view," and a glossary stated that "[c]ontinuous presence" was "an optional conference view where participants view other sites in one of four windows displayed simultaneously."  (Docket Entry No. 160, Ex. 5 at p. 44).

The PTO initially rejected all of the '288 Patent claims as obvious in light of Ricci and the Buyer's Guide.  (Docket Entry No. 160, Ex. 7).  Although the '288 Patent system supported "simultaneous viewing of images received from multiple locations," which Ricci and the other prior-art systems did not, (Docket Entry No. 160, Ex. 7 at p. 19), the PTO found that the addition of a continuous-presence display was an obvious modification of the systems described in earlier publications.  (*Id.* at pp. 19–20).  The PTO stated that although Ricci "does not teach the capability of simultaneous display of images of first and second patients," the Buyer's Guide suggested such a feature.  (*Id.*).  "While Ricci's 'bridging' hardware is capable of handling simultaneous calls, evidence on the record suggests only one image is displayed at a time because the specific 'bridging' hardware does not support simultaneous viewing of images received from multiple locations."

16

(*Id.* at p. 19).  The PTO concluded that it was obvious to modify Ricci's VTEL MCU-II system to add a bridge the Buyer's Guide recommended that "support[ed] continuous presence or the ability to display multiple images simultaneously."  (*Id.* at pp. 19–20).

Emtel argued that the prior art did not anticipate the '288 Patent or make it obvious because the system Ricci described could not display images from all of the video sources on the screen at the same time.  Emtel also asserted that Ricci discouraged using continuous-presence display and that the Buyer's Guide did not mention the potential telemedicine applications of continuous-presence technology.  (Docket Entry No. 160, Ex. 8 at p. 7).  Emtel argued that:

> In short, neither Ricci nor Buyer's Guide suggests the desirability of using "continuous presence" feature for telemedicine applications; and Ricci, moreover, teaches against it.  For at least the reasons stated above, adding "continuous presence" to a telemedecine system would not "improve a known system in a known manner" nor would it achieve similar or predictable results, as asserted in the Office Action.  The Examiner has thus failed to make a prima facie case that claims 9, 11, 12–13, and 18–20 are obvious over Ricci in light of Buyer's Guide.

(*Id.*).  These arguments prevailed.  The PTO confirmed the patentability of all of the '288 Patent claims in February 2014.  (Docket Entry No. 160, Ex. 9).

SOC asserts that Emtel's arguments and representations during reexamination effectively narrowed the meaning of "simultaneous" by restricting it to continuous-presence videoconferencing, as defined in the James declaration and the Buyer's Guide.  (Docket Entry No. 160).  Both the James declaration and the Buyer's Guide defined continuous-presence videoconferencing as the display of multiple video images at the same time, on a single monitor or in a single view.  Both James and the Buyer's Guide compared continuous-presence technology to the television game show "Hollywood Squares."  Emtel argues that it did not disclaim or surrender a broader meaning of

17

"simultaneously," but merely described the state of prior art. (Docket Entry No. 163).

A patentee's statements during prosecution cannot limit claim scope unless it is "clear and unmistakable that the patentee intended that limitation." *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1302 (Fed. Cir. 2013). Statements in the prosecution history that "merely provide an example to illustrate differences between the invention and the prior art" "do not indicate a disavowal or disclaimer of claim scope." *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1375 (Fed. Cir. 2004).

The prosecution history shows that Emtel disclaimed the "voice-activated switching" technology used in Ricci, and disclaimed technology that could not show two video images at once. But Emtel did not disclaim the meaning of "simultaneous" or "simultaneously" as "at the same time." Instead, Emtel stated that Ricci's technology did not permit "simultaneous display" or "simultaneous viewing" of images, as the relevant '288 Patent claims require, because Ricci did not show multiple video images "at the same time."

The opinion in *Shire Development, LLC v. Watson Pharma., Inc.*, 746 F.3d 1326, 1331 (Fed. Cir. 2014), *vacated on other grounds*, 135 S. Ct. 1174 (2015) (vacated in light of *Teva Pharmaceuticals USA, Inc., v. Sandoz, Inc.*, 574 U. S. —, 135 S. Ct. 831 (2015)), is instructive. The claims included both an "inner lipophilic matrix" and an "outer hydrophilic matrix." The defendant argued that the two matrices had to be "separate and distinct" structures because the plaintiff had disclaimed a single structure. *Id.* The Federal Circuit found that the plaintiff had "carefully characterized the prior art as not having separate matrices but never actually stated that the claimed invention does have separate matrices." *Id.* at 1332 (emphasis omitted). There was no broad disclaimer to overcome the prior art, but instead a description of the prior art.

18

Similarly, Emtel repeatedly argued that the Ricci system lacked continuous presence and that when Ricci was published in 1997, continuous-presence technology was the only technology that supported the simultaneous display of video images on a single screen.  But Emtel never stated that its own design did have continuous-presence technology, that its claimed design did not encompass the use of other technologies, or that only continuous-presence technology supported simultaneous display when the '970 Patent was issued in 2006.

*Gemstar-TV Guide Int'l*, 383 F.3d at 1374, is also instructive.  The patent at issue described a TV Guide system for users to see what is showing on television at a given time and date.  This guide allowed users to search by "combining" multiple selection criteria.  During prosecution, the patentee contrasted a prior-art system as unable to "automatically combine two selection criteria such as 'weather' and 'channels 2, 5, and 11.'"  *Id.* at 1375.  The defendant argued that this prior-art reference was a disavowal or disclaimer that limited "combining" to specific "AND/OR combinations" like the one referred to.  *Id.*  The Federal Circuit disagreed, finding that the reference to prior art "merely provide[d] an example to illustrate differences between the invention and the prior art.  In essence, Gemstar stated only that the [prior art] was incapable of performing a certain type of search, not that the scope of the claimed invention was limited to that particular type of search."  *Id.*  While the reference to prior art might have disclaimed a system that could not perform the particular type of search described, the reference did not limit the claimed invention to the type of search described in the example.  *See id.*  Arguments that prior art lacks a feature necessary for the patented claims, without more, do not present a basis to conclude that the claims are limited to that feature.  *See id.* at 1375 ("In essence, Gemstar stated only that the Kram reference was incapable of performing a certain type of search, not that the scope of the claimed invention was limited to that

particular type of search.").

During the reexamination proceedings, Emtel argued that a videoconference was not "simultaneous" unless it could display multiple video images at the same time.  Because Ricci did not allow multiple video images to be displayed at the same time, Emtel distinguished it from the '288 Patent claims on the basis that it was not simultaneous.  Like the patentee in *Gemstar*, Emtel used a term—continuous presence—as an example of what was simultaneous in the prior art, but it did not limit the scope of the claims to the particular technology—here, continuous-presence—described.

SOC contends that because Emtel described technology that could display multiple images simultaneously as continuous-presence technology, Emtel necessarily limited the meaning of "simultaneously" to exclude any technology other than continuous-presence.  But Emtel did not clearly and unambiguously limit "simultaneously" as SOC asserts.  Through Kelvin James's declaration, Emtel stated that when Ricci was published in 1997, continuous-presence technology was the only type allowing the simultaneous display or viewing of images.  Emtel did not state that in 2006, when the PTO issued the '970 Patent, or in 2013, when the PTO reexamined the '288 Patent, continuous-presence technology was the only system that supported simultaneous viewing or display, or that Emtel was limiting the claim scope to that particular type of continuous-presence technology.  The proceedings refer to "continuous presence or the ability to display multiple images from remote locations simultaneously," apparently contemplating that technology other than continuous-presence could support simultaneous display.  (Docket Entry No. 160, Ex. 7 at p. 20).

The definitions of continuous presence used in the James declaration and the Buyer's Guide,

20

and urged here by SOC, also suggest that Emtel did not intend to limit the terms "simultaneous" or "simultaneously" to the use of continuous-presence technology.  Both James and the Buyer's Guide define continuous presence as display on a single monitor or view.  But, as SOC conceded at the *Markman* hearing, the '288 Patent claims do not require a single monitor, and the prosecution history contains no evidence that Emtel disclaimed a multiple-monitor embodiment.  (Docket Entry No. 171 at pp. 19–20).  To the contrary, the '288 Patent claims a system that can incorporate multiple monitors.  The PTO confirmed the patentability of Claims 7, 10, and 16, all of which recite a two-monitor embodiment.  Claims 10 and 16 refer to a system with two monitors, in which one patient video image is displayed on each monitor.  ('288 Patent, col. 13, l. 41; col. 15, ll. 5–6).  Claim 7 refers to a dual-monitor system that "simultaneously display[s] a first patient on a first monitor and a second patient on a second monitor.  (*Id.*, col. 12, ll. 40–43).  And the specifications refer to a "plurality of video monitors, typically one for each of the remote emergency center facilities."  (*Id.*, col. 10, ll. 14–16).

Far from disavowing the use of two monitors, screens, or other displays, Emtel's representations to the PTO explicitly discussed the '288 Patent's two-monitor claims.  (*See*, *e.g.*, Docket Entry No. 160, Ex. 4 at pp. 18–19 ("Ricci does not state or describe any system including first and second monitors"), 22 ("the combination of Ricci and Hendricks does not teach or suggest displaying an image of the second patient on a second monitor while simultaneously displaying an image of the first patient on the first monitor."), 26 ("nor does David describe multiple video monitors")).

The Buyer's Guide states that continuous presence means "an optional conference view where participants view other sites in one of four windows displayed simultaneously."  The '288

Patent does not require four windows or four videos to be shown at the same time.  The '288 Patent claims that the medical practitioner will see at least two patient videos "simultaneously," and the specifications refer to a "plurality" of videos.  Nor do the claims state that the patients will view other patients, meaning that all of the "participants" will not view the other sites.  The '288 Patent is not limited to the exact definition of "continuous presence" given in the Buyer's Guide.

There are also practical reasons to reject SOC's proposed construction limiting "simultaneous" and "simultaneously" to "display[ing]" "images of at least two patients."  While SOC is correct that the '288 Patent requires at least two patients and requires that those two patients' images be displayed at the same time, these limitations are not based on, or derived from, the meaning of "simultaneously" or Emtel's alleged restriction of that term to continuous-presence technology.  Instead, other claim terms provide these limitations.  Claim 12, for example, requires "a first video image . . . of a first patient . . . and . . . a second video image . . . of a second patient . . . to be displayed simultaneously."  (Col. 13, l. 50–col. 14, l. 14).  Restricting "simultaneously" to the display of two or more patients' images here is redundant, because that limitation is already present in the claim.  Importing the requirement of two or more patients whose images are displayed conflates the meaning of "simultaneously" with the meaning of other claim terms and risks confusing the jury.

The James declaration, the Buyer's Guide, and SOC's proposed construction all define continuous presence by referring to "Hollywood Squares," a more-than dated television game show in which contestants played tic-tac-toe with celebrity guests to win prizes.  *See Hollywood Squares*, IMDb (last visited Aug. 19, 2015, 9:00 p.m.), http://www.imdb.com/title/tt0059995/.  Emtel's only reference to the Hollywood Squares type of display was through submitting the Buyer's Guide and

22

Kelvin James's declaration.  Both the Buyer's Guide and James compared continuous-presence technology to the Hollywood Squares television show's screen appearance.  The Guide and James used the Hollywood Squares reference as an example of how the simultaneous display of multiple video images in a continuous-presence system might look.  Emtel did not state that the claimed method or system was restricted to a layout that was "reminiscent of Hollywood Squares," and the record shows no such disclaimer.

SOC also appears to argue that even if there is no disclaimer, the court should include a reference to "Hollywood Squares" in the claim construction because the analogy would be helpful to the jury.  (*See* Docket Entry No. 166 at pp. 5–6.)  But there is no reason to believe that the jury will be confused by defining "simultaneous" as "at the same time," or that referring to the set design of a game show that many jurors are unlikely to know will help.[7]  The reference to "Hollywood Squares" is both unnecessary and potentially confusing.  This language is not incorporated into the court's construction of the disputed terms.

The construction "at the same time" is consistent with the ordinary meaning of the terms "simultaneous" and "simultaneously."  This construction can be applied consistently across the '288 Patent, is not redundant, does not import claim limitations that derive from other claim terms, and does not encourage the jury to confuse "simultaneously" with other claim terms.  Because the record shows no disclaimer in the reexamination proceedings, the court adopts this construction of the disputed terms.

---

[7]  The original show was cancelled in the 1980s.  *See Hollywood Squares*, IMDb (last visited Aug. 19, 2015, 9:00 p.m.), http://www.imdb.com/title/tt0059995/.  A new version of the show ran more recently but was cancelled in 2004. *See Hollywood Squares*, IMDb (last visited Aug. 19, 2015, 9:00 p.m.), http://www.imdb.com/title/tt0138968/.

IV.     **Conclusion**

"Simultaneous" and "simultaneously" are construed to mean "at the same time."  No later than August 31, 2015, the parties must inform the court whether they agree to mediation and, if so, the anticipated timeline for mediating this dispute.  The parties must also indicate whether they intend to file summary-judgment motions and, if so, propose a timeline for doing so.

SIGNED on August 24, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

24